IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,591




 


MICHAEL JAMES PERRY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM MONTGOMERY COUNTY





 

 Hervey, J., delivered the opinion of the Court in which Keller, PJ.,
Meyers, Price, Womack, Keasler, Holcomb, and Cochran, JJ., joined. Johnson, J.,
concurred.


O P I N I O N



 A jury convicted appellant of capital murder. The trial court sentenced appellant to death
pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant
raises seven points of error in his original brief and another point of error in a supplemental brief. 
We affirm.

 Appellant does not challenge the sufficiency of the evidence to support his conviction. The
evidence shows that appellant murdered the victim by shooting her with a shotgun while appellant
and another person were burglarizing her home. Later that night appellant was involved in the
murder of this victim's son and another person. Appellant was arrested about a week later in an
apartment where he had fled following a high-speed car-chase with the police during which appellant
injured his arm, and one of the other occupants in the car was shot by the police in an exchange of
gunfire. The injury to appellant's arm was serious enough to require treatment at a hospital. The
police obtained a written confession from appellant at the hospital.

 Appellant was charged and tried only for the murder of the mother during the burglary of her
home. Appellant testified at the guilt/innocence phase that he was not involved in this murder and
that his confession was not true. The following portion of appellant's confession was admitted into
evidence at the guilt/innocence phase:

 Last week, the week of October 22-26, my friend, Jason Burkett, and I decided we
needed to get a vehicle, or two vehicles. We both know a younger white male [the
burglary victim's son], known to us as Adam Stotler whose parents have a lot of
money. They also have a newer Camaro and Isuzu Rodeo.


 On Wednesday 10-24-01 Jason and I made a plan that we were going to ask to spend
the night with Adam at his house, and we were going to take the Camaro in the
middle of the night while Adam and his mom was [sic] sleeping. We went to
Adam's house at about 7 pm on Wednesday 10-24-01. Jason was driving his
girlfriend, Kristen Ranel's, blue Chevy truck, and I was riding in the passenger seat. 
We had a 12 gauge shotgun with us. Jason and I got to Adams [sic] house, and his
mom told us that Adam was not home, that he was at the skate park and would be
home around 9 pm.


 Jason and I left in the truck, but before we got out of the subdivision, Jason said that
it would be easier to get the car with only one person home. Jason and I then made
a plan that Jason would knock on the front door, and I would sneak in the back door,
through the garage with the shotgun. We went to Adam's house on foot and left
Kristen's truck down the road. I walked around to the side of the house through the
garage, and Jason knocked on the front door and asked to use the phone. When I
heard Jason talking on the phone, I went into the house through the back door in the
garage. Once in the house, I hid in the laundry room between the kitchen and garage. 
I then knocked on the back door, and when Adam's mom came to the back door, I
shot her one time in the side near her back with the shotgun. She fell to the floor, and
I dropped the shotgun.


 She then moved or tried to get up or something, and I grabbed the shotgun and shot
her one more time. She fell to the floor in front of the laundry room and garage, back
door. Jason freaked out and ran to the front door and opened the door. We calmed
down a little and grabbed the blankets and sheet off of the bed in the bedroom near
the kitchen and put the blankets and sheet over her because we did not want to look
at her. Jason ran and got Kristen's truck and brought it back to Adam's house. Jason
backed the truck into the garage, and we dragged Adam's mom's body and the
blankets out into the garage, where we loaded her into the back of the truck with the
blankets and sheet. I could not find the keys to the Camaro, and I remembered that
the inspection sticker was expired, and Adam's mom never drove it.


 Jason then got into the drivers [sic] side of the truck and I got in the passenger seat,
and Jason drove to an area he called Crater Lake. I did not know where Crater Lake
was, but I remember driving down a dirt road, then going across a big bump and
seeing some type of pipeline or something. We then drove down a cleared road and
saw an old stripped out truck blocking the road. The road to what Jason called Crater
Lake was off to the left of the stripped truck. Jason turned the truck around and first
tried to open the tailgate, speed backwards toward the pond, and try to slam on the
brakes to get the body to slide out. He did that I think twice, but it would not work
so we grabbed her body, and we rolled her down into the water. Jason and I then
threw sheets into the water on top of her and covered her up with some sticks and
brush we found near by. It was about 8:20-8:30 pm by that time, and we drove to
pick up Kristen, where she works at Big Dog Sports at the Outlet Mall in Conroe.


 I jumped the fence and ran to Adam's house. I got in the Camaro, which was parked
in the garage and drove it out of the garage. I pressed the button to close the garage
door, but it would not close so I drove off. I drove out of the gate, met Jason, and we
left to go to our trailer. Jason drove the white Isuzu with the shotgun in it, and I
drove the red Camaro. We went home, smoked several cigarettes, and then got
cleaned up and went to Nite Life.


 The rest of appellant's confession was admitted into evidence at the punishment phase of the
trial.

 We picked up Kristen and drove back to Adam's subdivision. Jason drove, Kristen
sat in the middle, and I sat on the passenger's side. We still had the shotgun with us. 
When we got to the subdivision, we could not get in, because we did not know the
gate code. We knew that Adam would be home soon so we waited at the gate, and
Adam pulled up in the white Isuzu Rodeo with another guy I know as Jeremy in the
passenger seat. While Jason, Kristen, and I waited at the gate for Adam, we agreed
on a story to tell Adam. Jason and I told Adam and Jeremy that a friend of ours had
shot himself while we were all hunting squirrels, and we needed their help to get him.


 We left the front of the subdivision and turned right onto the road in front of the
subdivision. We were still in the truck, and Adam and Jeremy followed us in the
Isuzu Rodeo. We then came to a stop sign and turned right. We then took the first
left off that road and crossed the railroad tracks. We drove down a dark, winding
road and stopped at I think was the first dirt road on the left. We all parked there, and
Jason, Jeremy, Adam, and I started walking back into the woods off the dirt road. 
Kristen sat in her truck. After we walked awhile, Adam realized where we were and
said that he knew an easier way to get to our friend.


 Adam and I went back to Adams [sic] Isuzu, and Jason and Jeremy stayed in the
woods. Adam drove me in his Isuzu to the 1st subdivision on the left off of the same
road we were on. Adam said that there was a road that went into the area we had
earlier walked to. I think we turned onto the first road on the left in that subdivision
and stopped at a cul-de-sac.


 Adam and I got out of the Isuzu and we saw Jason walking toward us with the
shotgun. Jason asked if we heard the gunshots and said that he was trying to let us
know where he was. I told him that I had heard two to three shots. Adam then
walked toward Jason, who did not have Jeremy with him, and Jason told him that he
(Jason) would take Adam to where the others supposedly were. I walked back to get
my cigarettes, and I saw Jason shoot Adam in the left side. I then covered my eyes. 
I heard a second gunshot and uncovered my eyes. I then saw Jason lean in close to
Adam and fire a third shot at close range. I walked over to Adams [sic] body and got
his car keys out of his pocket.


 Jason and I then went to the Isuzu, and Adam [sic] got in the drivers [sic] side with
me in the passenger side. We went back to where Kristin [sic] was waiting, and
Kristen asked Jason, "What happened" and then said, "Never mind I don't want to
know." Jason then said, "You're right, you don't want to know." Kristen's sister
called, and Kristen was upset and said she was going home. Kristen left in her truck,
and Jason drove me back to Adam's subdivision.


 I took the keys to the Camaro off of Adam's key ring for the Isuzu, and I jumped the
fence and ran to Adam's house. I got in the Camaro, which was parked in the garage
and drove it out of the garage. I pressed the button to close the garage door, but it
would not close so I drove off. I drove out of the gate, met Jason, and we left to go
to our trailer. Jason drove the white Isuzu with the shotgun in it, and I drove the red
Camaro. We went home, smoked several cigarettes, and then got cleaned up and
went to Nite Life.


 The shotgun we used came from a burglary that Jason and I did on Ave. E by the
Salvation Army. Jason and I both know the homeowner, and he drives a green Ford
Ranger. We took a Glock .40 and a 12 gauge defender out of the house. The 12
gauge defender is the shotgun we used to kill Adam's mom, Adam Stotler, and
Jeremy.


 I also took Adam's wallet out of his Isuzu with his driver's license.

 

 In point of error one, appellant claims that the trial court erroneously permitted the
prosecution to cross-examine him at the guilt/innocence phase with specific instances of his
unadjudicated misconduct for impeachment purposes. See Tex. R. Evid. 608(b) (generally
prohibiting cross-examination of a witness with specific instances of unadjudicated conduct for
impeachment purposes). The State argues, however, that the prosecution cross-examined appellant
with this evidence under the theory that appellant opened the door to it with his prior testimony that
"most of [his] problems were concentration type problems" related to his psychiatric disorders. See
generally Ochoa v. State, 481 S.W.2d 847, 850 (Tex.Cr.App. 1972) (party can open the door to
admission of otherwise inadmissible impeachment evidence).

 The record reflects that appellant did not object to this cross-examination. Appellant,
therefore, presents nothing for review. See id.; see also McDuff v. State, 939 S.W.2d 607, 618
(Tex.Cr.App.), cert. denied, 522 U.S. 844 (1997) (failure to object to proffered character testimony
forfeits appellate claim that it should not have been admitted). Point of error one is overruled.

 In points of error two and three, appellant claims that the trial court erroneously admitted
testimony at the guilt/innocence phase of appellant's involvement in the two other murders that
occurred on the same day as the capital murder for which he was on trial . In point of error two,
appellant complains about the admission of Sergeant Blair's testimony that he heard appellant tell
another detective that appellant did not shoot the victim's son.

 Q. [PROSECUTION]: And how does [appellant] respond when Detective Mace
introduces himself?


 A. [BLAIR]: He-he told him he knew what was going on, that he was-it was going
to be the needle or he was going to get the needle and he was just going to make it
easy on everybody and kind of started-we were, you know-I didn't shoot-he said
that he didn't shoot [the victim's son]--


 Q. Stop, stop, stop.


 A. Yes, sir. Sorry.


 Q. Let's back up.


 Strike that, please.


 In point of error three, appellant complains about the admission of another witness' testimony
that the police told her that appellant was a suspect in a triple homicide.

 Q. [PROSECUTION]: Okay. And what were you awakened by?


 A. [LAZRINE]: Officers at my door.


 Q. Okay. And who were they looking for?


 A. They were looking for [another person and appellant].


 Q. Okay. And did they tell you what or do you know what-why they were looking
for them?


 A. Yes. They said that they were suspects for a triple homicide.


 Appellant did not object to this testimony. We need not decide whether this testimony was
foreseeable because appellant also did not request an instruction to disregard or move for a mistrial. 
Appellant, therefore, failed to preserve any error. See Young v. State, 137 S.W.3d 65, 68-70
(Tex.Cr.App. 2004). Points of error two and three are overruled.

 In point of error four, appellant claims that the trial court erroneously denied an Article
38.23(a), Tex. Code Crim. Proc., instruction "due to disputed facts relevant to the voluntariness
of the appellant's oral statement following his arrest." When there are disputed fact issues on
whether evidence was legally obtained, a trial court is required to include a "properly worded"
Article 38.23 instruction when requested by the defendant. See Mendoza v. State, 88 S.W.3d 236,
239 (Tex.Cr.App. 2002); but see Thomas v. State, 723 S.W.2d 696, 707 (Tex.Cr.App. 1986)
(suggesting that trial court required to submit "properly worded" Article 38.23 instruction even when
not requested by the defendant). (1)

 The record reflects that the trial court denied appellant's pretrial motion to suppress his
confession based on conflicting evidence. See generally Guzman v. State, 955 S.W.2d 85, 87-89
(Tex.Cr.App. 1997). This issue was retried before the jury at the guilt/innocence phase. (2) Detective
Mace testified that he initially interviewed appellant, whose arm was bandaged, in the back of an
ambulance at the arrest scene. Mace testified that appellant began to make incriminating statements
when he introduced himself to appellant and before he could inform appellant of his rights.

 Q. [PROSECUTION]: Let me ask you this while you are looking through your
report. This statement-were the statements made by [appellant] before you asked
him any questions?


 A. [Mace]: Yes, they were. It was actually immediately upon me introducing myself
he started talking.


 Q. Okay.


 A. The first thing he stated was, "I know it's the needle and I want to save everybody
the trouble and just confess."


 Q. Okay. Now, when that statement was made to you, did you interrupt him?


 A. Yes, I did. He continued speaking about this. I interrupted him and advised him
of his Miranda rights.


 A paramedic testified that appellant's bandaged arm was cut to the bone and that appellant
had a "T-shirt, shorts and some socks on." Appellant complained that he was cold and that he was
"shivering a little bit." The paramedic also testified that he observed a "big knot on the back of
appellant's head" which was "possibly from contact with officer during apprehension." Appellant
was coherent, he did not seem intoxicated and he carried on a normal conversation with another
officer (Blair) on the way to the hospital.

 Blair testified that appellant did not ask for a lawyer at the arrest scene. The paramedic
testified that he heard appellant tell Detective Mace in the ambulance that "I know I have a lawyer,
but I am going to save us both a lot of time." Mace obtained a tape-recorded statement that was
reduced to writing at the hospital. Mace provided no testimony at trial on whether appellant invoked
his right to counsel at the hospital (although Mace testified at the pretrial suppression hearing that
appellant did not ask for a lawyer either in the ambulance or at the hospital). 

 Appellant testified that the police continued to question him after he had invoked his right
to counsel.

 Q. [DEFENSE]: Let me ask you if you will go back to the morning of-the early
morning of [October 30th]. You remember Detective Mace giving you some
warnings orally some time after 7:00 o'clock that morning?


 A. [APPELLANT]: In the morning? I don't recall.


 Q. You're not-and what I'm specifically talking about, your Miranda rights or
anybody's Miranda rights, a common term. You have the right to remain silent and
not make any statement and any statement might be used against you at trial. Any
statement you might make can be used as evidence against you in a court of law. 
You have the right to have a lawyer present to advise you during-prior to and during
any questioning. If you can't afford a lawyer, you have the right to have a lawyer
appointed to advise you prior to and during any questioning. And do you have-and
you have the right to terminate, if you began an interview, at any time that you saw
fit. Now, do you remember those warnings being given to you in the ambulance out
there at Wildwood Forest?


 A. I think he did. Until I-sorry. Sorry. Sorry. Sorry. I caught myself.


 Q. Your answer is what?


 A. Yes, he did.


 [PROSECUTION]: Objection. Asked and answered. Obviously, he said he gave
him the warnings.


 [THE COURT]: Sustained.


 Q. And then at any time thereafter, were you read or given your Miranda rights
again?


 A. No, sir.


 Q. At any time that morning prior to Detective Mace arriving or subsequent to his
arrival, did you announce to anybody that you wanted a lawyer?


 A. Yes, sir.


 Q. Did that request go unheeded?


 A. What's unheeded?


 Q. Was there any response to that request?


 A. No.


 Q. Did they continue talking to you?


 A. Yeah. Their response was continuing talking [sic].


 Q. And you give this statement to Detective Mace because you were frightened. Is
that what I heard your testimony to be?


 A. One of the many reasons.


 Q. And what other reasons?


 A. I was just shocked, tired and wanted to be left alone. I was just overwhelmed with
everyone around me. I was dizzy. I just-all the talking, attacking-


 Appellant also provided testimony suggesting that the police coerced him into making a false
confession.

 Q. [DEFENSE]: Let me restate the question. Why do you put your name on
something that's not the truth?


 A. [APPELLANT]: It would-I would have to start from the time of arrest, if you
want me to.


 Q. I want you to-


 A. All right.


 Q. -answer the question.


 A. At the time I had had-I had previous encounters with the law like a misdemeanor
drug possession or something that I missed a court date on and I knew I had a warrant
for it. The night of October 24th, 2001,[ (3)] I had been drinking heavily on quite-quite
a few amount of pills and we ended up sleeping in a white Rodeo as a result of not
being able to drive, neither-any of the occupants in the car. We didn't feel safe
driving because of our influence. We pulled over and slept. Shortly after I continued
to drink in the car. I must have passed out. I might have been asleep ten minutes. 
I couldn't tell you the exact amount of time, but a patrolman woke us up telling us
to freeze, put our hands up. At the time when he pulled his-he had a gun out. He
told us to freeze. I tried to attempt [sic] to get on the ground, exit the car and get on
the ground. I was kind of scared and nervous at this point. [Jason] Burkett was
talking about balls to the walls or some statement along that effect. He had a
shotgun, so I-and from what Kristin-from what people had told me, what I had heard
him say, I knew that he was capable of doing almost anything now. We ended up
wrecking through a glass building. I witnessed Jason get shot. I was cut pretty badly. 
He kind of assisted me to some apartments. And at the time of arrest-I will jump to
that-the door was not kicked in, but forced open and many officers-I couldn't tell
you how many. Three or four with dogs came in the apartment. I was stood up
against the wall by [Blair]. I had a gun shoved in my face. Told to the best of my
recollection how would you-he [one of the victims of the triple homicide] was my
friend or she was my friend or how could you do something like that. You are damn
well going to tell me-tell me what happened and I was put on the ground and the
knee in the back of my head and cuffed. Then put on the pavement for a pretty long
amount of time. They asked to put me in the ambulance. I wasn't put in there
because we were waiting for [Mace] and finally Ms. Connie [a paramedic] or
whoever the supervisor was at the time-I now know her name to be Connie-had
asked to put me in there. At the time there was quite a bit of excitement. I was under
the influence. My arms hurt pretty bad and I was real scared. I was just totally-I was
being a suspect. I wasn't charged yet, but I was a suspect in a triple homicide or
capital murder. At the time of bringing me to the hospital, my condition in my mind
state was that I am going to tell [Mace] anything he wants to hear to get him away
from me, to get me out of this situation and that's what I did. I was hungry, tired and
just fed up and, for one, I really didn't-


 The trial court denied appellant's request for an instruction directing the jury not to consider
appellant's confession if it was "due to intoxication or illness resulting from the loss of blood." 
Appellant's requested instruction stated:

 A statement of an accused may be used in evidence against him if it appears that the
same was freely and voluntarily made without compulsion or persuasion. 
"Intoxication" means not having the normal use of mental faculties by reason of the
introduction of alcohol, a controlled substance, a drug, a dangerous drug, a
combination of two or more of those substances, or any other substance into the
body. Now, if you find from the evidence, or if you have a reasonable doubt thereof,
that at the time the defendant gave the oral statement to [Mace], if the defendant did
give it, the defendant was reduced to a condition of physical and mental impairment,
due to intoxication or illness resulting from the loss of blood, such as to render such
oral statement, if any, not voluntary, then you will wholly disregard the oral statement
and not consider it for any purpose, nor any evidence obtained as a result thereof.


 Appellant argues on appeal that the trial court should have submitted his requested
instruction or, "if the trial court did not like that particular instruction, some other instruction
covering the voluntariness issue" solely because "there was conflicting testimony as to whether [he]
was intoxicated and whether he was in a distressed condition due to injuries and being cold." 
Assuming that there is other evidence to support a finding that appellant's intoxication and injury
overbore appellant's will and caused him to confess, (4) the evidence of appellant's intoxication and
injury does not raise any constitutional voluntariness issues because this evidence does not involve
any police coercion or other official over-reaching. See Colorado v. Connelly, 479 U.S. 157, 163-166 (1986) (integral element to support involuntariness finding is police overreaching or coercion). 
Point of error four is overruled.

 Appellant claims in point of error five that, pursuant to the Supreme Court's decisions in
Ring v. Arizona (5) and Apprendi v. New Jersey, (6) the trial court should have instructed the jury that the
State was required to prove beyond a reasonable doubt that the jury should answer "no" to the
mitigation special issue. Appellant claims in a supplemental brief that our prior decisions rejecting
this claim (7) have been called into question by the Supreme Court's more recent decision in Blakely
v. Washington, U.S. , 124 S.Ct. 2531 (2004).

 Apprendi and Ring decided that the aggravating facts involved in those cases that increased
the penalty beyond the prescribed statutory maximum had to be "submitted to a jury, and proved
beyond a reasonable doubt." See Ring, 536 U.S. at 609; Apprendi, 530 U.S. at 490. (8) This Court has
rejected claims that Apprendi and Ring apply to the mitigation special issue because a defendant is
already eligible for a death sentence by the time the jury reaches the mitigation special issue, and,
therefore, a "no" answer to the mitigation special issue would not increase this punishment. See,
e.g., Blue, 125 S.W.3d at 501.

 In Blakely, the Supreme Court stated that the statutory maximum sentence for Apprendi
purposes "is the maximum sentence a judge may impose solely on the basis of the facts reflected in
the jury verdict . . . ." See Blakely, U.S. at , 124 S.Ct. at 2537 (emphasis in original). The Court
stated:

 Our precedents make clear, however, that the "statutory maximum" for Apprendi
purposes is the maximum sentence a judge may impose solely on the basis of the
facts reflected in the jury verdict or admitted by the defendant. [Citations omitted]. 
In other words, the relevant "statutory maximum" is not the maximum sentence a
judge may impose after finding additional facts, but the maximum he may impose
without any additional findings. When a judge inflicts punishment that the jury's
verdict alone does not allow, the jury has not found all the facts "which the law
makes essential to the punishment," [citation omitted], and the judge exceeds his
proper authority.[ (9)]

 

 Based on this passage from Blakely, appellant argues that, by the time the jury reached the
mitigation special issue, the maximum sentence that he could have received based on the jury's
partial and incomplete verdict was life (even though this partial verdict made him death-eligible). (10) 
Appellant further argues that, since a "no" answer to the mitigation special issue could have
increased this maximum sentence from life to death, then, contrary to our decisions in cases such as
Blue, the principles underlying Apprendi, Ring and Blakely are applicable to the mitigation special
issue. (11) The issue is whether the jury's finding on the mitigating evidence special issue is a "fact
legally essential to the punishment." See Blakely, U.S. at , 124 S.Ct. at 2543 (as "Apprendi held,
every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential
to the punishment") (emphasis in original). 

 Initially, we note that the mitigation special issue is a legislative response to the Supreme
Court's decision in Penry v. Lynaugh. (12) It is clear that Apprendi, Ring and Blakely apply only to
aggravating facts that the prosecution must prove to support a particular sentence. (13) The holding
in Ring expressly applies to "an aggravating circumstance necessary for imposition of the death
penalty." See Ring, 536 U.S. at 609.

 This view is supported by footnote 16 of Apprendi discussing "the distinction the Court has
often recognized . . . between facts in aggravation of punishment and facts in mitigation." See
Apprendi, 530 U.S. at 490 n.16. (14) This view of distinguishing between facts in aggravation of
punishment and facts in mitigation finds further support in Justice Scalia's (the author of Blakely)
concurring opinion in Ring, wherein he describes the imprecise Sixth Amendment claim put forth
and rejected in Walton v. Arizona (15) (which Ring overruled):

 In Walton, to tell the truth, the Sixth Amendment claim was not put with the clarity
it obtained in . . . Apprendi. There what the appellant argued had to be found by the
jury was not all facts essential to the imposition of the death penalty, but rather
"every finding of fact underlying the sentencing decision," including not only the
aggravating factors without which the penalty could not be imposed, but also the
mitigating factors that might induce a sentencer to give a lesser punishment.[ (16)]

 

Ring, 536 U.S. at 611 (Scalia, J., concurring).

 It is, therefore, clear that what a jury is asked to decide in the mitigation special issue is not
a "[fact] legally essential to the punishment." See Blakely, U.S. at , 124 S.Ct. at 2531 (Apprendi
holds that every defendant has the right to insist that the prosecutor prove to a jury all facts legally
essential to the punishment); Blue, 125 S.W.3d at 501 (by the time jury reaches the mitigation special
issue, the State has already demonstrated the defendant's eligibility for a death sentence). By the
time the jury reaches the mitigation special issue, the prosecution has proven all aggravating "facts
legally essential to the punishment." See Blakely, U.S. at , 124 S.Ct. at 2531; Tuilaepa, 512 U.S.
at 971-75. This Court's decisions in cases such as Blue are consistent with Apprendi, Ring and
Blakely. Point of error five is overruled. 

 In point of error six, appellant claims that the "trial court erred in failing to instruct the jury
that the State has the burden of proof beyond a reasonable doubt on the mitigation issue, because the
Texas statute gives the jury mixed signals as to how the mitigation issue is to be applied." The
mitigation special issue does not send "mixed signals" because it permits a capital sentencing jury
to give effect to mitigating evidence in every conceivable manner in which the evidence might be
relevant. See Johnson v. Texas, 509 U.S. 350, 367-69 (1993); Cockrell v. State, 933 S.W.2d 73, 93,
(Tex.Cr.App. 1996), cert. denied, 520 U.S. 1173 (1997). Point of error six is overruled.

 In point of error seven, appellant claims the "trial court erred by not instructing the jury that
each juror had the power to prevent assessment of the death penalty by blocking a unanimous verdict
for the State." This Court has rejected this claim. See Cathey v. State, 992 S.W.2d 460, 466
(Tex.Cr.App. 1999), cert. denied, 528 U.S. 1982 (2000). Point of error seven is overruled.

 In a supplemental point of error, appellant claims that it offends "the principles underlying
[the United States Supreme Court's recent decision in] Tennard v. Dretke, [ U.S. , 124 S.Ct. 2562
(2004)] to instruct a capital sentencing jury to disregard evidence that the jurors do not find to be
sufficiently connected to the crime to reduce moral blameworthiness." This Court has decided that
the mitigation special issue "does not unconstitutionally narrow the jury's discretion to factors
concerning only moral blameworthiness." See Cantu v. State, 939 S.W.2d 627, 648-49
(Tex.Cr.App.), cert. denied, 522 U.S. 994 (1997). The Supreme Court's Tennard decision, which
was decided under another statutory scheme that did not include the mitigation special issue, does
not hold otherwise. See Tennard, U.S. at , 124 S.Ct. at 2569-72 ("impaired intellectual
functioning" is inherently mitigating and, therefore, meets the definition of "constitutionally
relevant" mitigating evidence). The supplemental point of error is overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: December 15, 2004

Publish 
1. Since appellant's only complaint on appeal is that the trial court refused his requested
instruction, it is unnecessary in this case to resolve any conflict between our decision in Mendoza
and our decision in Thomas on the issue of whether a trial court must sua sponte submit any other
"properly worded" Article 38.23 instruction. 
2. See Atkinson v. State, 923 S.W.2d 21, 23 (Tex.Cr.App. 1996) (issue of whether evidence
should be excluded under Article 38.23 may also be tried to the jury).
3. The record reflects that appellant was arrested on October 30th and that he murdered the
victim on October 24th.
4. See State v. Terrazas, 4 S.W.3d 720, 723-24 (Tex.Cr.App. 1999) (statement involuntary
"only if there was official, coercive conduct of such a nature that any statement obtained thereby was
unlikely to have been the product of an essentially free and unconstrained choice by its maker").
5. 536 U.S. 584 (2002).
6. 530 U.S. 466 (2000).
7. See, e.g., Blue v. State, 125 S.W.3d 491, 501 (Tex.Cr.App. 2003), cert. denied, U.S.L.W. 
 (U.S. October 4, 2004) (No. 03-10832).
8. These holdings are based on the Sixth Amendment right to a jury trial and "the right to have
every element of the offense proved beyond a reasonable doubt." See, e.g., Apprendi, 530 U.S. at
477 n.3.
9. Blakely, U.S. at , 124 S.Ct. at 2537 (emphasis in original).
10. See Tuilaepa v. California, 512 U.S. 967, 971-75 (1994) (describing legally essential facts
that make a defendant death-penalty eligible).
11. Appellant argues in a supplemental brief:


 Thus, the Blakely decision clarifies our understanding of the rule of Apprendi with
respect to the meaning of the statutory maximum punishment for the crime. In this
context, the "maximum" is not the maximum sentence that may be imposed after a
jury finding of additional punishment facts, but the maximum that may be imposed
without any additional jury findings. The maximum sentence that may be imposed
upon a Texas capital defendant [by the time the jury reaches the mitigation special
issue] alone is life imprisonment. In order to receive death, his sentencing jury must
also return a ["no"] answer to the mitigation special issue, which means that the jury
has found a new ultimate fact adverse to the defendant: his mitigation case was not
sufficient to warrant a life sentence.


(Emphasis in underline in original) (Emphasis in italics added).
12. 492 U.S. 302 (1989).
13. See, e.g., Ring, 536 U.S. at 597-98 n.4 (noting that Ring's claim was "tightly delineated" and
made no "Sixth Amendment claim with respect to mitigating circumstances") and at 612 (Scalia, J.,
concurring) ( what "today's decisions says is that the jury must find the existence of the fact that an
aggravating factor existed") (emphasis in original).
14. A state may, without violating due process, even require a defendant to prove facts in
mitigation of punishment. See Martin v. Ohio, 480 U.S.228, 230-36 (1987) (no violation of due
process for state to require a defendant to prove self-defense); Patterson v. New York, 432 U.S. 197,
201-02 (1977) (same with respect to extreme emotional disturbance). It is noteworthy that
appellant's supplemental brief even refers to "his mitigation case" in the context of apparently
arguing that the State has the burden to disprove "his mitigation case" beyond a reasonable doubt. 
See Footnote 11. 
15. 497 U.S. 639 (1990), overruled by Ring, 536 U.S. at 609.
16. Emphasis in original.