IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-75,023





BEUNKA ADAMS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 15057


IN THE 2
ND JUDICIAL DISTRICT COURT


CHEROKEE COUNTY






 Cochran, J., delivered the opinion of the unanimous Court.


O P I N I O N



 In August 2004, a jury convicted appellant of capital murder. (1) Based on the jury's
answers to the special issues, (2) the trial judge sentenced appellant to death. (3) Direct appeal to
this Court is automatic. (4) After reviewing appellant's ten points of error, we find them to be
without merit. Therefore, we affirm the trial court's judgment and sentence of death.

Facts

 On September 2, 2002, Candace Driver and Nikki Dement (5) were working at BDJ's
convenience store in Rusk, Texas. Kenneth Vandever, a customer described as mentally
challenged who often "hung around" at BDJ's and helped take out the trash, was in the store
with Candace and Nikki when two masked men entered the store. One of the men was armed
with a shotgun and demanded money. The two men were later identified as appellant and his
co-defendant, Richard Cobb.

 After taking the money from the cash register, appellant demanded the keys to a
Cadillac parked outside. After Candace produced her car keys, appellant forced her, along with
Nikki and Kenneth, into the car. As appellant drove Candace's car, Nikki said, "I know you,
don't I?" Appellant said "Yes," and took his mask off. When they arrived at a remote pea patch
near Alto, Cobb pointed the shotgun at Candace and Kenneth and appellant ordered them to get
into the trunk of the Cadillac. Appellant then took Nikki to a more secluded spot, away from
the car, and sexually assaulted her. Later, appellant led Nikki back to the Cadillac and let
Candace and Kenneth out of the trunk, but he tied the two women's arms behind their backs and
made them kneel on the ground while the two robbers made their escape. Appellant and Cobb
seemingly developed a plan to leave Kenneth untied so that he could free the women once
appellant and Cobb were far enough away from the scene. Appellant, however, believed that
Kenneth was attempting to untie the women too soon, so he returned and ordered Kenneth to
kneel behind the women. Candace heard Kenneth say that "it was time for him to take his
medicine and that he was ready to go home."

 The women then heard a single gunshot. Appellant asked, "Did we get anybody?" And
Candace said, "No." Shortly thereafter, a second shot was fired, and Kenneth cried out, "They
shot me." Kenneth Vandever died from the gunshot wound. Seconds later, Candace heard
another shot, and Nikki fell forward. Candace fell forward as well, pretending to be hit. 
Appellant approached Candace and asked her if she was bleeding. He was carrying the shotgun. 
Candace did not immediately answer in the hope that appellant would believe she had been
killed. Appellant then said, "Are you bleeding? You better answer me. I'll shoot you in the
face if you don't answer me." When Candace said, "No, no, I'm not bleeding," appellant shot
her in the face, hitting her lip. 

 Appellant and Cobb then turned to Nikki, asking her the same questions. Appellant
kicked Nikki for about a minute, joined by Cobb. Then they picked her up by her hair and held
a lighter to her face to see if she was still alive. Candace feigned death for fear of being shot
again. She heard Cobb say about Nikki, "She's dead. Let's go." (6) That was the only time that
Candace ever heard Cobb speak. After appellant and Cobb left, Candace got up and ran
barefooted down the deserted country road and banged on the door of the first house she saw.

Sufficiency of the Evidence

 In his first point of error, appellant alleges that the evidence at trial was neither legally
nor factually sufficient to support the capital-murder verdict because the State failed to prove
that he intentionally and personally shot and killed Kenneth Vandever. He notes that neither
Candace nor Nikki actually saw who pulled the trigger of the shotgun when Kenneth was
killed. (7) 

 When deciding whether evidence is legally sufficient to support a conviction, we assess
all of the evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could find the essential elements of the crime beyond a reasonable doubt. (8) 
Evidence is factually insufficient when, although legally sufficient, it is "so weak" that the
verdict "seems clearly wrong or manifestly unjust," or it is "against the great weight and
preponderance of the evidence." (9)

 Appellant was indicted for intentionally causing the death of Kenneth Vandever by
shooting him with a firearm in the course of committing or attempting to commit (1) robbery
or kidnaping of Candace Driver, Kenneth Vandever, or Nikki Dement, or (2) aggravated sexual
assault of Nikki Dement. The charge authorized the jury to convict appellant as a principal or
as a party.

 The jury heard testimony from both Candace Driver and Nikki Dement that from the
time appellant and Cobb entered BDJ's convenience store until they left, appellant was in
charge, giving orders, and threatening the victims with the shotgun. Appellant demanded the
money from the register at BDJ's as well as the keys to the car parked outside. Appellant
ordered Candace and Kenneth into the trunk of the car, and appellant sexually assaulted Nikki. 
Later, appellant forced the women to kneel with their hands tied behind their backs. Appellant
took charge of his and Cobb's escape from the scene, but then he returned and ordered
Vandever to kneel as well. When Candace heard the first shot, appellant asked if anyone was
hit. When she said no, the shot that killed Kenneth was fired. Candace testified that when
appellant approached her after Nikki was shot, he was holding the shotgun, and she said that it
was appellant who fired the shotgun when he learned that she was not bleeding. Nikki testified
that appellant lifted her by her hair and kicked her to find out if she was still alive.

 The jury also heard testimony from Lavar Bradley, who had been incarcerated with
appellant in the Cherokee County Jail, that appellant bragged that he had fired the shotgun
"because Cobb didn't have the balls to do it."

 From this evidence, the jury could have reasonably inferred that appellant fired the shot
that killed Kenneth Vandever. Or, because the jury was charged on the law of parties, the jury
could have found that appellant, acting with the intent that Cobb kill Kenneth, aided and assisted
his co-defendant in that murder. (10) While the State's evidence may not conclusively show that
appellant fired the shot that killed Kenneth, at the very least, the evidence, viewed in the light
most favorable to the verdict, established beyond a reasonable doubt that appellant participated
as a party. Thus, the evidence was legally sufficient to support the jury's verdict. Furthermore,
the evidence is factually sufficient because it is not so weak that the verdict is clearly wrong
and manifestly unjust, nor is it against the great weight and preponderance of the evidence. 
Appellant makes no separate argument about the factual sufficiency of the evidence except to
reiterate that no witness and no testimony conclusively demonstrated that the hand that fired
the fatal shot at Kenneth was his own. But that is not the standard by which either legal or
factual sufficiency is judged because the jury could find appellant guilty if he either fired the
fatal shot himself or assisted his co-defendant in committing the murder. Appellant fails to
make any argument that he was not involved in the robbery-murder or that there was legally or
factually insufficient evidence that he intended Kenneth's death and assisted Cobb in
committing that act. Point of error one is overruled.

Admission of Evidence

 In points of error two through four, appellant complains of the admission, during the
punishment phase, of testimony concerning extraneous violent acts. (11) Appellant argues that
the admission of this testimony violated both his Sixth Amendment right to confrontation and
the provisions of Article 37.071, § 2(a).

 To preserve error for appellate review, a party must make a timely and specific
objection or motion at trial, and there must be an adverse ruling by the trial court. (12) The rules
of evidence also require an objection to a ruling admitting evidence. (13) Failure to preserve error
at trial forfeits the later assertion of that error on appeal. (14) In fact, almost all error - even
constitutional error - is forfeited if a party fails to object. (15) We have consistently held that
the failure to object in a timely and specific manner during trial forfeits complaints about the
admissibility of evidence. (16) This is true even though the error may concern a constitutional
right of the defendant. (17)

 Appellant admits that he did not object to the admission of this evidence at trial, and he
does not argue that his current complaints fall within any exceptions to the contemporaneous
objection rule. As a result, appellant has forfeited appellate review of any error associated
with the admission of the complained-of testimony. Points of error two through four are
overruled.

Future Dangerousness

 In his fifth point of error, appellant claims that the evidence is insufficient to support
the jury's affirmative answer to the future-dangerousness punishment issue. (18) Appellant asserts
that the State's evidence "establishes nothing more than appellant was a troubled child who
acted out by getting [sic] and had trouble adhering to the management of the juvenile authority."

 A jury may consider a variety of factors when determining whether a defendant will pose
a continuing threat to society. (19) We must view all of the evidence in the light most favorable
to the jury's finding and determine whether, based on that evidence and reasonable inferences
therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the
future dangerousness issue was "yes." (20) 

 The State introduced evidence that, in the days preceding the instant offense, appellant
participated in two aggravated robberies with Cobb. During those offenses, appellant had
remained outside, and no one was physically hurt or injured. Following those offenses,
appellant kept the shotgun and shells used in the robberies. Both appellant and Cobb planned
the robbery at BDJ's. Unlike the other two robberies, appellant decided to go into the store
with Cobb at BDJ's.

 The jury heard that during this robbery, appellant was the leader. He did nearly all the
talking, including commanding Cobb and giving orders to the three victims. The jury also heard
that it was appellant who initiated the kidnaping and was in charge during that time. At the
scene of the sexual assault and shootings, appellant was again doing all of the talking and
giving orders. Candace testified that appellant threatened to kill her if she did not do what he
said. Nikki testified that it was appellant who sexually assaulted her. The jury also heard that
it was appellant who forced all three victims to kneel. After the first shot was fired, appellant
questioned whether anyone had been hit, and it was appellant who fired the shotgun again when
Candace said she was not bleeding. Appellant then began kicking Nikki in the chest so hard that
he fractured her ribs and then lifted her up by her pony-tailed hair to see if she was still alive. 

 The State also presented evidence that appellant was in charge of Cobb's and his escape
from the scene of the shootings. While his statements to law enforcement downplayed his
role, appellant later bragged about the shooting to another jail inmate. Further, the State
produced evidence of appellant's bad character as a law-abiding citizen. Additionally, the State
presented expert psychiatric testimony that appellant fit the profile of a person for whom there
is a probability of future dangerousness.

 A rational jury could determine from this evidence that, beyond a reasonable doubt,
there was a probability that appellant would commit criminal acts of violence in the future so
as to constitute a continuing threat to society. Point of error five is overruled.

Sufficiency of the Evidence Regarding the Mitigation Issue

 In his sixth point of error, appellant argues that the evidence is insufficient to support
the jury's negative answer to the mitigation special issue. This Court, however, does not
review the jury's finding on the mitigation issue for sufficiency of the evidence because "the
determination as to whether mitigating evidence calls for a life sentence is a value judgment
left to the discretion of the fact finder." (21) Appellant's sixth point of error is overruled.

Constitutionality of Article 37.071

 In his seventh point of error, appellant argues that the Texas death-penalty scheme
violates the Eighth Amendment prohibition against cruel and unusual punishment because it
allows jurors too much discretion in deciding who receives the death penalty and who does not. 
This Court has previously considered and rejected this claim, and appellant has given us no
reason to reconsider it here. (22) The seventh point of error is overruled.

 In his eighth point of error, appellant alleges that the Texas death-penalty scheme is
unconstitutional under Penry v. Johnson (23) because the mitigation issue "sends mixed signals
to the jury thereby rendering any verdict reached in response to that special issue intolerably
unreliable." Penry is distinguishable because, in that case, the jury received a judicially crafted
nullification instruction. (24) Here, the jury received the statutorily prescribed question required
under Texas law, which does not contain a nullification instruction. (25) No error exists. (26) The
eighth point of error is overruled.

 In his ninth point of error, appellant argues that Article 37.071 is unconstitutional
because it places the burden on him to prove that there are mitigating circumstances rather than
requiring the State to prove insufficient mitigating circumstances beyond a reasonable doubt. 
This Court has previously rejected this claim, and appellant has given us no reason to revisit
the issue here. (27) The ninth point of error is overruled.

Challenge to the Grand Jury Array

 In his tenth point of error, appellant complains of the trial court's refusal to quash the
indictment against him because the grand jury allegedly was not comprised of a representative
cross-section of Cherokee County citizens. In his motion to quash, appellant alleged that the
grand jury that handed down the indictment was comprised of twelve non-Hispanic citizens and
as such its composition was not representative of the population of Cherokee County, which
is 8.9 percent Hispanic. Appellant argues that he has presented a prima facie case of
discrimination because his evidence shows that, over the course of the statistical period
presented, approximately sixteen grand jurors should have been Hispanic, but that the actual
number was considerably less. (28) 

 During the hearing on his motion to quash, appellant presented evidence consisting of
Cherokee County grand jury lists, census materials, and telephone books for the preceding ten
years prior to his trial. However, this evidence showed no definitive demographic conclusions
about the number of Hispanics who served on grand juries during that time. (29) In fact, testimony
during the hearing showed that several grand jurors whom appellant believed were non-Hispanic were known to be Hispanic by either the district clerk or the district judge.

 While the record does show that no one with an identifiably Hispanic surname sat on
the grand jury that indicted appellant, we have previously noted that relying on surnames alone
is not a reliable indication of the heritage of individuals chosen for grand jury service. (30) 
However, even if we were to rely on identifiably Hispanic surnames, as appellant suggests, his
argument would fail. In the two years before appellant was indicted, ten percent of the grand
jurors in Cherokee County had identifiably Hispanic surnames. In the eight most recent grand
juries, over seven percent of the grand jurors had identifiably Hispanic surnames. Census
records show that the Hispanic population of Cherokee County during this time ranged from
7.9 to 8.9 percent.

 While the grand jury that indicted appellant contained no grand jurors with identifiable
Hispanic surnames, after examining the records of recent earlier grand juries, we are not able
to conclude that the absence of identifiable Hispanics on appellant's grand jury was caused by
purposeful discrimination. The tenth point of error is overruled.

 We affirm the judgment of the trial court. 


Delivered: June 27, 2007


Do Not Publish
1. Tex. Penal Code Ann. § 19.03(a). 
2. Tex. Code Crim. Proc. art. 37.071, §§ 2(b) & (e).
3. Tex. Code Crim. Proc. art. 37.071, § 2(g).
4. Tex. Code Crim. Proc. art. 37.071, § 2(h). 
5. Between the time of the offense and the time of trial, Nikki Ansley married, taking the name
Nikki Ansley Dement. She is referred to throughout this opinion by her married name, Nikki Dement.
6. In fact, Nikki had not died. She was life-flighted to a hospital, but she had suffered broken
ribs, a broken shoulder blade, and a collapsed lung. The shotgun blast had torn away a 15 by 12
centimeter "divot" of skin and tissue on her left shoulder blade.
7. Appellant argues

 No witness put the gun in [appellant's] hand during the killing of Vandever, nor was the
weapon found with the possession or control of [appellant], nor was any comment even
overheard by either [Candace or Nikki] that could be induced to conclude that
[appellant] shot Vandever.
8. Jackson v. Virginia, 443 U.S. 307 (1979). 
9. Watson v. State, 204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006).

10. Rabbani v. State, 847 S.W.2d. 558-59 (Tex. Crim. App. 1992).
11. Appellant does not specify precisely what evidence should have been excluded. He claims
that "the State presented certain witnesses, that through the course of their testimony, related facts
intimating extraneous acts, through reference to records and documents, in particular, the material
proffered in the course of testimony by Dr. Tynus McNeel (R.R. Vol. 61, pg. 80) and Mr. A.P.
Merillat (R.R. Vol. 63, pg. 118). 
12. Tex . R. App . P. 33.1 (a); Tucker v. State, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999). 

13. Tex. R. Evid. 103(a)(1). 
14. Ibarra v. State, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999).
15. Tex . R. App . P. 33.1 (a); Aldrich v. State, 104 S.W.3d 890, 894-95 (Tex. Crim. App.
2003). 
16. Saldano v. State, 70 S.W.3d 873, 889 & nn 73-74 (Tex. Crim. App. 2002).
17. Id. 
18. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). 
19. See Wardrip, 56 S.W.3d at 594 n.7; Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim.
App. 1987). 
20. Ladd v. State, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).
21. Green v. State, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); Colella v. State, 915
S.W.2d 834, 845 (Tex. Crim. App. 1995); Hughes v. State, 897 S.W.2d 285, 294 (Tex. Crim. App.
1994). 
22. Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); McFarland v.
State, 928 S.W.2d 482, 519 (Tex. Crim. App. 1996). 
23. 532 U.S. 782 (2001).
24. Penry, 532 U.S. at 789-90. 
25. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
26. See McFarland, 928 S.W.2d at 488-89. 
27. See Perry v. State, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004), cert. denied, 126
S. Ct. 416, 163 L. Ed. 2d 317 (2005); Blue v. State, 125 S.W.3d 491, 500-01 (Tex. Crim. App.
2003). 
28. See Castaneda v. Partida, 430 U.S. 482 (1977).
29. See Ovalle v. State, 13 S.W.3d 774, 779-80 & n. 22 (Tex. Crim. App. 2000). 
30. Id.