

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-18-00465-CR

_____

CHRISTOPHER LEWIS ROTH, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 4
Denton County, Texas
Trial Court No. CR-2016-09799-D

---

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In a single issue, Appellant Christopher Lewis Roth appeals his conviction for driving while intoxicated (DWI). *See* Tex. Penal Code Ann. § 49.04. Roth argues that the trial court erred by denying his motion to suppress because the officer's traffic stop was conducted without reasonable suspicion. We agree with Roth; the State did not meet its burden to establish reasonable suspicion. We reverse and remand.

## Background

City of Frisco police officer Julio Vargas was the only witness at the suppression hearing. Officer Vargas testified that in the early morning hours of March 20, 2015, 9-1-1 dispatch reported "that there were two subjects inside RaceTrac. One was in a - - or had pulled up in a white F-150. The other one was in a black-colored SUV. Both subjects were inside the store slurring their speech and stumbling." When Officer Vargas responded to the call, he spotted a white Ford F-150 pulling out of the RaceTrac parking lot. Officer Vargas immediately initiated a traffic stop and, after an investigation, arrested the driver, Roth, on suspicion of DWI.

On cross-examination, Officer Vargas confirmed that the only basis for the stop was his suspicion that Roth was intoxicated. He testified that his suspicion was based upon the information relayed from the 9-1-1 dispatcher. But what Officer Vargas could not state with certainty was whether the dispatcher had informed him before the stop that the male and female were "stumbling and slurring" -

2

Q. Okay. You testified that the 911 caller said that a male and a female were stumbling and slurring. Correct?

A. That's correct.

Q. And then they were getting in their cars to leave.

A. That's correct.

Q. Did you receive the information in that order?

A. I don't remember how the order came in, but that - - the information was prior to making the stop.

Q. It was prior to making the stop?

A. I believe so.

Q. But you're not certain?

A. I'm not – I'm not certain, but I believe so.

Q. Okay. So there is a possibility that this information - - that you did not get the information about slurring speech before you activated your overhead lights.

A. I don't know about the slurring speech.

Q. And the stumbling.

A. I don't know if that - - because those two, I think, came together, but I don't know if that came before the stop. The information that I got was that there were two intoxicated subjects and they were leaving in a white F-150 and a black SUV.

Officer Vargas admitted that he did not state in his application for a DWI blood draw that he detained Roth after learning that he was "stumbling and slurring" inside the RaceTrac. And although Officer Vargas suggested that he may have

included the "stumbling or slurring" information in the report he prepared after the stop, other information in the record suggests to the contrary. At the conclusion of the evidence, Roth's attorney argued that neither the report nor the affidavit in support of the warrant contained any information about the timing of the "stumbling and slurring" evidence –

> In reading through [Officer Vargas's] report, reading through his affidavit for the search warrant, he does not give one single articulable fact to support reasonable suspicion. He doesn't mention slurring. He doesn't mention stumbling.
>
> I pinned the officer down to confirm the reason that he stopped Mr. Roth, and he said the reason was because of an intoxication - - intoxicated persons call. I asked if there were any other reasons. He said no. Other reasons would have been a report of someone stumbling, slurring, articulable facts. He didn't have any of them.

The state did not object to counsel's statement or refute his contention in rebuttal argument. And the report was not admitted into evidence. To the extent that the 9-1-1 recording could have shed light on the timing of the "stumbling and slurring" information, it too was not admitted into evidence.

At the end of the hearing, the trial court found that Officer Vargas did not have the "stumbling and slurring" information at the time he stopped Roth. In denying the motion to suppress, the trial court stated,

> I'm taking the position that . . . Officer Vargas . . . does not have the stumbling or the slurred speech in his information at the time he stopped [Roth] . . . . But my interpretation of Derichsweiler and these cases are if law enforcement as a whole has that information, whether he has it or not, it's counted towards the - - being not just conclusory, but being enough for reasonable suspicion.

4

So I am finding that there was reasonable suspicion for the stop.

The trial court later entered findings of fact and conclusions of law that included the following relevant findings and conclusions:

3. Officer Vargas testified before this Court at a hearing on defendant's Motion to Suppress. The Court finds his testimony to be credible in all respects.

. . .

5. On March 20, 2015, at approximately 1:36 a.m., Frisco PD 911 dispatch received a 911 call from Cameron Soller,[1] an employee of the RaceTrac located at 4740 Main Street, Frisco, Texas.

6. The caller reported that two intoxicated individuals had been stumbling around and slurring their speech inside of the RaceTrac and were leaving the store in their respective vehicles.

7. Unaware of the information in 5. & 6. above, Officer Vargas heard the 911 dispatcher advise of an intoxicated persons call located at 4740 Main Street, Frisco, Texas.

8. Officer Vargas was notified by the dispatcher that one of the intoxicated individuals had gotten into a white pick-up truck and was heading out from 4740 Main Street onto Legacy Drive.

---

[1]This finding is unsupported by the record—the RaceTrac employee was never identified by name during the hearing or in any exhibits admitted into evidence at the hearing. The State dismisses this discrepancy by arguing that a witness statement attached to Officer Vargas's probable cause affidavit and filed in the trial court was "available to the trial court" and to Roth. But at no point did the trial court take judicial notice of its file (nor did the State make such a request) and the State made no attempt to offer this witness statement into evidence. On appeal, the State offers no authority for its argument that everything contained in the trial record should be considered on appeal to fill in the holes in the State's proof at a hearing. We decline to apply that standard.

9. Upon arrival at the RaceTrac, Officer Vargas observed a white Ford F-150 leaving the parking lot of 4740 Main Street and heading northbound on Legacy Drive.

10. Officer Vargas observed the vehicle make a U-turn to head southbound on Legacy Drive toward Main Street.

11. Due to the 911 call regarding a potentially intoxicated driver, Officer Vargas initiated a traffic stop on the white truck for suspicion of driving while intoxicated.

. . . .

CONCLUSIONS OF LAW

. . . .

2. A temporary detention, under the Fourth Amendment, is justified when the officer has specific articulable facts which, taken together with rational inferences from those facts, lead the officer to conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968).

3. The detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). A 911 police dispatcher is ordinarily regarded as a "cooperating officer" for purposes of making this determination. *Id.*

4. Information provided to police from a citizen-informant who identifies himself and may be held to account for accuracy and veracity of his report may be regarded as reliable. *Id. at 914-15.* [sic]

5. Here, Frisco PD 911 dispatcher was aware that an identified 911 caller was reporting an intoxicated person slurring his speech and stumbling inside of the caller's place of employment and attempting to drive away.

6. These facts, when combined with rational inference from those facts, led officer Vargas to reasonably detain defendant for driving while intoxicated.

7. As a result, the Court finds that Officer Vargas had sufficient reasonable suspicion to pull over and temporarily detain defendant.

## Discussion

### I. Standard of review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). Therefore, we defer almost totally to the trial court's rulings on (1) questions of historical fact, even if the trial court determined those facts on a basis other than evaluating credibility and demeanor, and (2) application-of-law-to-fact questions that turn on evaluating credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

7

Stated another way, when reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

Even if the trial court gave the wrong reason for its ruling, we must uphold the ruling if it is both supported by the record and correct under any applicable legal theory. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

## II. The Fourth Amendment and reasonable suspicion

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *State v. Martinez*, No. PD-0324-17, 2019 WL 137754, at *1 (Tex. Crim. App. Jan. 9, 2019) (quoting *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Handy v. State*, 189 S.W.3d 296, 299 n.2 (Tex. Crim. App. 2006)); *Handy*, 189 S.W.3d at 298–99; *see,*

*e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980).  Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable.  *Martinez*, 2019 WL 137754, at *1 (quoting *Russell*, 717 S.W.2d at 9); *Amador*, 221 S.W.3d at 672–73.

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts.  *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).  An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law.  *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State,* 158 S.W.3d 448, 492 (Tex. Crim. App. 2005).  Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity.  *Ford*, 158 S.W.3d at 492.  This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop.  *Id.*

The detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining

9

whether reasonable suspicion exists." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 1924 (1972); and quoting *Hoag v. State*, 728 S.W.2d 375, 380 (Tex. Crim. App. 1987)). 9-1-1 police dispatchers are ordinarily regarded as cooperating officers for purposes of reasonable-suspicion determinations. *Id.* And information provided to police "from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable." *Id.* at 914–15 (citing *Adams*, 407 U.S. at 147, 92 S. Ct. at 1924). Our only question in such a scenario is "whether the information that the known citizen-informant provide[d], viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot." *Id.* (internal citation omitted).

### III. Application

We agree with the trial court's conclusion that the 9-1-1 dispatcher was a "cooperating officer" and, as such, the dispatcher's knowledge was imputed to Officer Vargas. *See id.* at 914. But here we must specifically focus on the 9-1-1 dispatcher's knowledge prior to Officer Vargas's detention of Roth. *See id.* (reciting that the cumulative information known "at the time of the stop" is to be considered in determining whether reasonable suspicion exists). The State carried the burden to establish that the 9-1-1 dispatcher knew, prior to the detention, specific, articulable facts that, when combined with reasonable inference, would lead an officer to

10

reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *See Ford*, 158 S.W.3d at 492. A report of someone "being intoxicated" is a subjective determination that does not provide the specific, articulable facts necessary to establish reasonable suspicion. *See Castro v. State*, 227 S.W.3d 737, 742 (Tex. Crim. App. 2007).

Whether the 9-1-1 dispatcher knew that the RaceTrac employee had observed Roth and his accomplice "slurring words and stumbling" and reported that fact to 9-1-1 before Officer Vargas detained Roth (or at all) is not established in the record before us. Neither the 9-1-1 dispatcher nor the RaceTrac employee testified at the hearing. The State did not offer a recording of the 9-1-1 call into evidence. The sole basis for the trial court's finding that "The caller reported that two intoxicated individuals had been stumbling around and slurring their speech inside of the RaceTrac and were leaving the store in their respective vehicles" was Officer Vargas's testimony. But not only did Officer Vargas's testimony not establish when he knew that fact—which the trial court acknowledged in its findings—Officer Vargas's testimony also fell short of establishing even when the 9-1-1 dispatcher knew that information. According to Officer Vargas, the earliest that he would have made a note about Roth's "stumbling or slurring" would have been after he had already "made contact" with Roth, and the record does not indicate that any note to that effect was ever made.

11

The State asks us to disregard these discrepancies because Roth's cross-examination established that he was aware of a "call sheet" or "post-run call report" detailing the dispatcher's communication with the caller and officers in the field, and that "[i]f [Roth] had definitive evidence that the caller did not report stumbling and slurring until after the stop, presumably from the call sheet, he failed to introduce that evidence into the record." In making such an argument, the State invites us to reverse the burden of proof. It was the State's burden—not Roth's—to establish reasonable suspicion. *See Martinez*, 2019 WL 137754, at *1; *Amador*, 221 S.W.3d at 672–73. We therefore reject this argument.

The evidence showed nothing more than that at some time before Roth was detained by Officer Vargas, a RaceTrac employee reported to 9-1-1 the presence of two intoxicated persons in the store, one of whom was about to drive away in a white F-150. Because this is not sufficient to establish reasonable suspicion, *see Castro*, 227 S.W.3d at 742, we sustain Roth's sole issue on appeal.

## Conclusion

Having sustained Roth's sole issue on appeal, we reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 26, 2019