FILED IN
COURT OF CRIMINAL APPEALS

June 30, 2015

ABEL ACOSTA, CLERK

AP-77,039
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/30/2015 2:13:55 PM
Accepted 6/30/2015 2:54:26 PM
ABEL ACOSTA
CLERK

## No. AP-77,039

In the
**Texas Court of Criminal Appeals**

————◆————

**No. 1414421**
In the 351st District Court
Of Harris County, Texas

————◆————

# JEFFERY KEITH PREVOST
*Appellant*
V.
# THE STATE OF TEXAS
*Appellee*

————◆————

STATE'S APPELLATE BRIEF

————◆————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**ANNA EMMONS**
**CRAIG GOODHART**
Assistant District Attorneys
Harris County, Texas

**HEATHER A. HUDSON**
Assistant District Attorney
Harris County, Texas
State Bar No. 24058991

1201 Franklin, Suite 600
Houston, Texas  77002
Tel.:  713/755-5826
Fax No.:  713/755-5809

*Counsel for Appellee*

ORAL ARGUMENT WAIVED

## IDENTIFICATION OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), a complete list of the names of all interested parties is provided below.

**COUNSEL FOR THE STATE:**

Ms. Devon Anderson—District Attorney

Ms. Anna Emmons
Mr. Craig Goodhart—Assistant District Attorneys at trial

Ms. Heather A. Hudson—Assistant District Attorney on appeal

**APPELLANT:**

Jeffery Keith Prevost

**COUNSEL FOR APPELLANT:**

Mr. R.P. "Skip" Cornelius
Mr. Allen Mark Tanner—Counsel at trial

Mr. Douglas M. Durham—Counsel on appeal

**PRESIDING JUDGE:**

Hon. Mark Kent Ellis

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Tᴇx. R. Aᴘᴘ. P. 39.7, the State waives oral argument.

**TABLE OF CONTENTS**

IDENTIFICATION OF THE PARTIES ..................................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................ ii

INDEX OF AUTHORITIES..............................................................................iv

STATEMENT OF THE CASE.............................................................................1

STATEMENT OF FACTS ..................................................................................1

SUMMARY OF THE ARGUMENT ......................................................................8

REPLY TO APPELLANT'S FIRST, SECOND

      & THIRD POINTS OF ERROR ................................................................10

Appellant has not preserved a claim that the State's failure to file written
    notice of its intent to seek the death penalty violated his rights to due
    process and due course of law..........................................................................10

REPLY TO APPELLANT'S FOURTH & FIFTH POINTS OF ERROR ...............13

    I.    The trial court did not err in refusing to declare Article 37.071 of
        the Texas Code of Criminal Procedure unconstitutional because
        the special mitigation issue does not violate the Sixth
        Amendment's requirement that all aggravating circumstances
        necessary for the imposition of the death penalty must be proved
        beyond a reasonable doubt....................................................................13

    II.   The trial court did not err in failing to hold that the Texas capital
        murder statute violates the Due Process Clause because sudden
        passion is a mitigating factor for punishment, rather than a fact
        necessary to constitute the charged offense...........................................15

REPLY TO APPELLANT'S SIXTH POINT OF ERROR ......................................17

The trial court did not abuse its discretion in granting the State's challenge for cause to prospective juror William Hered because he gave contradictory responses regarding his willingness to follow the law. ...............17

REPLY TO APPELLANT'S SEVENTH, EIGHTH, NINTH .................................21

& TENTH POINTS OF ERROR ..........................................................................21

    I.   The introduction of inadmissible testimony regarding an extraneous incident did not necessitate a mistrial. ................................22

    II.   The trial court did not abuse its discretion in refusing to grant a mistrial after Vicki Alexander testified that she wanted appellant to receive the death penalty....................................................................26

    III.   It was not improper for the prosecutor to ask a question on cross-examination implying facts already in evidence. ...................................28

    IV.   A mistrial was not required to cure error from the prosecutor's assertion that bribery of correctional officers is prevalent within the Texas Department of Corrections. .................................................32

CONCLUSION AND PRAYER .............................................................................35

CERTIFICATE OF COMPLIANCE .....................................................................35

CERTIFICATE OF SERVICE ..............................................................................36

# INDEX OF AUTHORITIES

**CASES**

*Almanza v. State*,
  686 S.W.2d 157 (Tex. Crim. App. 1985)...........................................................11

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ................................................................................ 13, 14

*Batten v. State*,
  533 S.W.2d 788 (Tex. Crim. App. 1976)..........................................................12

*Bauder v. State*,
  921 S.W.2d 696 (Tex. Crim. App. 1996)..........................................................34

*Briggs v. State*,
  789 S.W.2d 918 (Tex. Crim. App. 1990)..........................................................11

*Busby v. State*,
  253 S.W.3d 661 (Tex. Crim. App. 2008)..........................................................31

*Clark v. State*,
  365 S.W.3d 333 (Tex. Crim. App. 2012)..........................................................10

*Colburn v. State*,
  966 S.W.2d 511 (Tex. Crim. App. 1998)..........................................................32

*Garcia v. State*,
  887 S.W.2d 862 (Tex. Crim. App. 1994)..........................................................17

*Gardner v. State*,
  306 S.W.3d 274 (Tex. Crim. App. 2009)..........................................................18

*Gardner v. State*,
  730 S.W.2d 675 (Tex. Crim. App. 1987)..........................................................22

*Gonzales v. State*,
  353 S.W.3d 826 (Tex. Crim. App. 2011)..........................................................18

*Hartman v. State*,
  507 S.W.2d 553 (Tex. Crim. App. 1974)..........................................................31

*Hudson v. State*,
  675 S.W.2d 507 (Tex. Crim. App. 1984)..........................................................34

*Jones v. United States*,
  526 U.S. 227 (1999) ...............................................................................13

*Ladd v. State*,
  3 S.W.3d 547 (Tex. Crim. App. 1999)..................................... 21, 31, 32

*Lawrence v. State*,
  700 S.W.2d 208 (Tex. Crim. App. 1985)................................................16

*Moore v. State*,
  969 S.W.2d 4 (Tex. Crim. App. 1998)...................................................17

*Mullaney v. Wilbur*,
  421 U.S. 684 (1975) ...............................................................................16

*Ovalle v. State*,
  13 S.W.3d 774 (Tex. Crim. App. 2000)............................................ 23, 32

*Perry v. State*,
  158 S.W.3d 438 (Tex. Crim. App. 2004)......................................... 14, 17

*Ring v. Arizona*,
  536 U.S. 584 (2002) ......................................................................... 13, 14

*Rogers v. State*,
  640 S.W.2d 248 (Tex. Crim. App. 1981)...............................................11

*Rogers v. State*,
  725 S.W.2d 350 (Tex. App.--Houston [1st Dist.] 1987, no pet.).........................31

*Simpson v. State*,
  119 S.W.3d 262 (Tex. Crim. App. 2003).......................................... 27, 28

*Thompson v. State*,
  612 S.W.2d 925 (Tex. Crim. App. 1981).......................................... 22, 23

*Valle v. State*,
  109 S.W.3d 500 (Tex. Crim. App. 2003)................................................32

*Wesbrook v. State*,
  29 S.W.3d 103 (Tex. Crim. App. 2000)...............................................16

**STATUTES**

Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01 ............................................ 17

Acts 1973, 63rd Leg., p. 1127, ch. 426, art. 3, §§ 4 & 5, eff. June 14, 1973 ........... 12

TEX. CODE CRIM. PROC. ANN. art. 1.14 (West 1967) ................................................ 12

TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(1) (West 2015) .................................... 18

TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (West 2015) .................................... 18

TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2015) ............................................. 11

TEX. PENAL CODE ANN. § 19.02(d) (West 2015) ..................................................... 15

**RULES**

TEX. R. APP. P. 33.1(a) ............................................................................................. 10

TEX. R. APP. P. 38.1(i) ............................................................................................. 14

TEX. R. EVID. 103(e) ................................................................................................ 11

TEX. RULE EVID. 602 ............................................................................................... 22

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

**STATEMENT OF THE CASE**

Appellant was charged by indictment with capital murder. (I C.R. 2). The indictment alleged that appellant intentionally and knowingly caused the deaths of Sherry White and Kyle Lavergne during the same criminal transaction. *Id.* Appellant pled "guilty" to the charged offense and he was convicted by a jury of capital murder. (19 R.R. 4, 7). At the conclusion of the punishment phase of trial, the jury unanimously determined beyond a reasonable doubt that appellant would commit criminal acts of violence that would constitute a continuing threat to society. (VII C.R. 1498). The jury also unanimously determined beyond a reasonable doubt that the mitigating circumstances were not sufficient to warrant a sentence of life without parole rather than a sentence of death. (VII C.R. 1499). Accordingly, appellant was sentenced to death. (VII C.R. 1502-03; 30 R.R. 6). Appellant filed a timely written notice of appeal. (VII C.R. 1505-06).

**STATEMENT OF FACTS**

Appellant met complainant Sherry White in March of 2011, shortly after he was released from prison for a 20-year aggravated assault sentence.[1] (21 R.R. 44-45). Appellant's sister, Vicki Alexander, allowed him to move into her Houston

---

[1] Between February of 1998 and the completion of his original 20-year sentence in 2010, appellant was released on parole six times. (24 R.R. 111-17). Each time he was released, appellant committed a new offense and his parole was revoked. *Id.*

apartment temporarily until he found a job. (23 R.R. 147-48). Appellant met White at a family function held at Alexander's apartment. (21 R.R. 44-45; 23 R.R. 150). Alexander and White had been best friends for about 30 years. (21 R.R. 43). White soon began dating appellant in spite of warnings from Alexander and other relatives about appellant's past "problems" with women. (23 R.R. 152). Appellant had a lengthy history of violent behavior towards women.

Appellant and White initially appeared to be very happy together. (23 R.R. 151). Over the course of the next few months, however, White's friends noticed that appellant became increasingly possessive of White. (23 R.R. 155). Appellant also frequently asked White for money. (23 R.R. 158). White intended to end the relationship. (23 R.R. 157). On May 8, 2011, White called Alexander crying and said that appellant was at her house "doing something" to her. (23 R.R. 157-58). Appellant's daughter Lorraine got on the phone with appellant and told him to leave White alone. (23 R.R. 158). Appellant returned home several hours later. (23 R.R. 158).

After that incident, appellant left Houston and went to live with Lorraine in Port Arthur for a week. (23 R.R. 159-60). Appellant returned to Houston on May 15th. (23 R.R. 160-61). White picked him up at the bus station and allowed him to stay at her home until Thursday night, May 19th. (23 R.R. 161). Then White dropped appellant off at Alexander's apartment. (23 R.R. 162). White did not tell

appellant that she had plans to go to a casino with her friends on Friday night because she did not want appellant to know where she was going. (23 R.R. 163). White failed to show up for work the next day. (20 R.R. 29-31). White also missed the trip to the casino. (20 R.R. 32-33). Her friends called her repeatedly, but were unable to reach her. (20 R.R. 28-31, 23 R.R. 167, 171, 177).

Several weeks beforehand, Alexander's daughter Ashley Barbideaux was looking for something under the driver's seat of her mother's car when she found a kitchen knife. (21 R.R. 46-47). At the time, Barbideaux was also living at Alexander's apartment. (21 R.R. 49). She returned the knife to the kitchen, but later found another knife hidden underneath the driver's seat. (21 R.R. 47).

On the Friday morning that White went missing, appellant unexpectedly volunteered to give Alexander a ride to work at 5:00 a.m. (21 R.R. 50; 23 R.R. 164). Appellant dropped Alexander off and left in her car. (23 R.R. 165). Alexander left her cell phone with appellant. (23 R.R. 165). Later that morning, Barbideaux and Jasmine Norton, Alexander's goddaughter, needed to use the car. (21 R.R. 51, 80). They called White's house around 9:00 a.m. and spoke with appellant. (21 R.R. 51-52, 81). Appellant said he was returning with the car. (21 R.R. 52). Appellant was in a hyper mood when he arrived at the apartment around 10:00 a.m. (21 R.R. 53). He walked upstairs with a bottle of Crown Royal and said "boo." (21 R.R. 53, 82-83). Appellant suggested that Barbideaux and Norton

3

should "get fucked up" with him. (21 R.R. 54). Appellant also said that he was going to marry White, and he wanted Barbideaux and Norton to be in the wedding. (21 R.R. 55).

That same morning, appellant offered to sell Barbideaux a red camera which he claimed he found at a pool party. (21 R.R. 62, 87). Appellant also asked Norton if she knew anyone who would be interested in purchasing a gun for $150.00. (21 R.R. 84). When Alexander returned home from work, she and appellant went to a game room and gambled until 6:00 a.m. (21 R.R. 57, 93). Appellant did not appear to be concerned about White. (21 R.R. 95, 23 R.R. 175).

The following morning, White's cousin, John Elder, went to White's home to check on White and her 20-year-old son Kyle Lavergne. (20 R.R. 36-28). The front door was locked and the blinds were drawn. (20 R.R. 55). Officer Traci Seals was dispatched to White's home to conduct a welfare check. (20 R.R. 50). Under the supervision of Officer Seals, Elder broke into the home through a back window. (20 R.R. 57-58).

He discovered Lavergne's body lying by the front door. (20 R.R. 41). There was a gunshot wound to Lavergne's head. (20 R.R. 58). Stippling around the gunshot wound to Lavergne's head indicated that the gun was fired from a distance of less than two feet away. (22 R.R. 155). There was also a gunshot wound to Lavergne's left arm. (22 R.R. 143).

4

Officer Seals and two backup officers proceeded to search the home. (20 R.R. 61-62). The phone cord had been ripped from the wall. (21 R.R. 125). In Lavergne's bedroom they noticed a bullet hole in the pillowcase and recovered a bullet lodged inside the pillow. (20 R.R. 120-21).

White's deceased body was found in the bathroom. (20 R.R. 64). White was seated on the toilet with her head tilted back. (20 R.R. 66). There was a large amount of blood pooled in the bottom of the bathtub, and the outline of a bloody handprint was visible on the tile wall. (20 R.R. 65, 138-40). A man's broken watch was on the bathroom floor next to White's foot. (20 R.R. 77, 133). White had been shot at close range in the back and in the head. (23 R.R. 62, 67-70). White had also been stabbed 21 times. (23 R.R. 60). There were defensive wounds on her left hand, and a large gash to her face had split the skin from her lip down to her chin. (23 R.R. 21, 50-51). One of the stab wounds to White's chest was delivered with enough force to penetrate the sternum and pierce her heart. (23 R.R. 31-32).

As police continued to investigate the crime scene, a crowd of White's friends and family members began to gather outside the home. (20 R.R. 88). Alexander and appellant drove to White's home that morning to check on her. (23 R.R. 178-79). When they arrived at the scene and learned that White and Lavergne were deceased, appellant appeared strangely calm and unaffected. (23 R.R. 137,

5

181-82).  Appellant also had blood on his shoes.  (22 R.R. 54).  A swab of the blood was collected and submitted for DNA testing.  (22 R.R. 54).  The DNA results showed that White could not be excluded as a contributor to the DNA profile.  (22 R.R. 102).  In addition, appellant could not be excluded as a contributor to the DNA profile obtained from White's fingernail scrapings.  (22 R.R. 99).

Barbideaux and Norton approached the police at the scene and informed them that appellant had sold Barbideaux a camera.  (21 R.R. 64).  The police showed them an empty camera box found in White's house.  (21 R.R. 101).  They recognized the red camera on the box as the same one Barbideaux had purchased from appellant.  (21 R.R. 101, 135).  Alexander gave police consent to search her home.  (23 R.R. 186).  They found the camera in a bag along with a receipt bearing the name Sherry White.  (21 R.R. 16).

Appellant was transported to the homicide division of the police department for questioning.  (20 R.R. 89).  Initially, appellant repeatedly denied having any involvement in the commission of the crime.  (21 R.R. 145).  Appellant eventually confessed that he went to White's house around 6:30 on the morning of May 20th.  (32 R.R. SX 197).  Appellant said that he was upset because he knew White was planning to go to a party that night.  *Id*.  When appellant's niece called and said she needed the car, White went into the bathroom and started getting ready for work.

*Id.* Appellant retrieved the revolver she kept hidden underneath the bed. *Id.* Appellant also disconnected the phone. *Id.* While White was in the bathroom, appellant went into Lavergne's bedroom and fired a single shot at Lavergne's head. *Id.* Without looking to see whether the shot had struck Lavergne, appellant immediately went to the bathroom and told White to calm down and stay there. *Id.* Then appellant saw Lavergne run out of his bedroom and down the hallway. *Id.* Appellant fired the gun at him. *Id.* Lavergne made it as far as the front door before appellant caught up with him and shot him. *Id.*

Appellant returned to the bathroom and explained to White why he was upset. *Id.* According to appellant, he got tired of listening to White and he shot her twice at close range. *Id.* The impact of the gunshots caused her to fall into the bathtub. *Id.* Appellant stated that White got up out of the tub, sat down on the toilet, and continued to talk to him. *Id.* White pleaded for medical help. *Id.* Appellant said that he went to the kitchen, retrieved a knife, and stabbed White repeatedly. *Id.* Before he left, appellant took White's camera, her revolver, and two bottles of Crown Royal. *Id.*

Appellant claimed that he had been planning the murder for four days. (22 R.R. 8-9). He was placed under arrest and charged with capital murder. (22 R.R. 5).

7

## SUMMARY OF THE ARGUMENT

*Points of Error One, Two & Three:* Appellant did not raise any objection at trial to the State's failure to file written notice of its intent to seek the death penalty; therefore, appellant's complainants that the lack of notice violated his rights to due process and due course of law have not been preserved for appellate review. Moreover, the lack of written notice was not error because the State is no longer statutorily required to provide written notice of its intent to see the death penalty. Finally, appellant makes no argument showing that he was harmed in any way by the lack of written notice.

*Points of Error Four & Five:* The trial court did not err in failing to declare the death penalty statute unconstitutional. The mitigation special issue in Article 37.071 of the Texas Code of Criminal Procedure does not violate the Sixth Amendment's guarantee of a jury trial because it does not allow the jury to assess a death sentence without having first determined beyond a reasonable doubt the aggravating circumstances necessary for the imposition of the death penalty. The mitigation special issue is a factor in mitigation of punishment, which is distinguishable from a factor in aggravation of punishment. Therefore, the jury does not have to find the mitigation special issue beyond a reasonable doubt.

Furthermore, the trial court did not err in refusing to declare the capital murder statute unconstitutional. The State is not required to prove the absence of

8

sudden passion to satisfy due process requirements because the issue of sudden passion is a mitigation factor bearing on punishment, rather than a fact necessary to constitute the charged offense.

***Point of Error Six:*** The trial court did not abuse its discretion in granting the State's challenge for cause to prospective juror William Hered because Hered gave contradictory responses during voir dire regarding his ability to answer the special issues in Article 37.071. Hered also admitted that he could not truthfully answer the first special issue.

***Points of Error Seven, Eight, Nine & Ten:*** The trial court did not abuse its discretion in denying appellant's various requests for a mistrial based upon improper questions and answers. After each instance, the trial court promptly instructed the jury to disregard the question or the witness's response. Appellant has not shown that the challenged evidence was so prejudicial that it was impossible for the jury to withdraw the impression it produced on their minds. Thus, appellant has not overcome the presumption that the jurors followed the trial court's curative instructions.

9

## REPLY TO APPELLANT'S FIRST, SECOND,

## & THIRD POINTS OF ERROR

*Appellant has not preserved a claim that the State's failure to file written notice of its intent to seek the death penalty violated his rights to due process and due course of law.*

In his first two points of error, appellant contends that the State's failure to file written notice of its intent to seek the death penalty violated his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, as well as his right to due course of law under Article I, section 19 of the Texas Constitution. In a third point of error, appellant alleges that the lack of notice was so egregious that it deprived him of a fair and impartial trial.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a). As a threshold matter, appellant concedes that his first and second points of error have not been preserved for review because no objection was raised at trial regarding the lack of written notice of the State's intent to seek the death penalty. *See* (Appellant's Brief p. 47 n.41). The State agrees. Constitutional errors may be waived on appeal if the complaining party fails to properly object. *Clark v. State*, 365 S.W.3d 333 (Tex. Crim. App. 2012). Appellant failed to raise any objection at trial; therefore, his complaint has been

waived on appellate review. *See Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990); *Rogers v. State*, 640 S.W.2d 248, 264 (Tex. Crim. App. 1981).

Appellant nevertheless suggests that the State's failure to file written notice of its intent to seek the death penalty deprived him of a fair and impartial trial; therefore, it should be reviewed on appeal as fundamental error. *See* (Appellant's Brief p. 49).

Texas criminal jurisprudence recognizes that fundamental error may be reviewed for the first time on appeal. *See* TEX. R. EVID. 103(e) ("In criminal cases, a court may take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved"). For instance, error in a court's charge which was not objected to is reversible error if it deprives the defendant of a fair and impartial trial. *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2015) ("the judgment shall not be reversed . . . unless it appears from the record that the defendant has not had a fair and impartial trial"); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (holding that unpreserved charge error is reversible if the error was so egregious that the defendant was denied a fair and impartial trial).

Here, however, appellant cites no authority supporting his contention that the State's failure to file written notice of its intent to seek the death penalty constitutes fundamental error. Indeed, Texas law no longer imposes any statutory obligation

upon the State to provide written notice of its intent to seek the death penalty.

Formerly, Article 1.14 of the Texas Code of Criminal Procedure required the State

to give timely written notice of its intent:

> The defendant in a criminal prosecution for any offense may waive any rights secured him by law except the right of trial by jury in a capital felony case in which the State has made known in open court in writing at least 15 days prior to trial that it will seek the death penalty. No case in which the State seeks the death penalty shall be tried until 15 days after such notice is given.

TEX. CODE CRIM. PROC. ANN. art. 1.14 (West 1967). In 1973, Article 1.14 was

amended to remove this requirement. *See* Acts 1973, 63rd Leg., p. 1127, ch. 426,

art. 3, § 5, eff. June 14, 1973. Articles 35.15 and 35.17 were also amended to

delete any references to the State providing notice that it would seek the death

penalty. *Id*. §§ 4,5. In light of these legislative amendments, this Court has held

that the State is not statutorily required to give notice of its intent to seek the death

penalty. *See Batten v. State*, 533 S.W.2d 788, 793 (Tex. Crim. App. 1976). Thus,

the State's failure to file written notice of its intent to seek the death penalty was

not error, much less fundamental error.

12

Moreover, counsel for appellant does not allege that appellant was actually surprised by the State's election to seek the death penalty.[2]  Accordingly, appellant has not shown that the lack of written notice deprived him of a fair and impartial trial.  As such, appellant's complaint has not been preserved for appellate review and his first three points of error should be overruled.

## REPLY TO APPELLANT'S FOURTH & FIFTH POINTS OF ERROR

I.  *The trial court did not err in refusing to declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional because the special mitigation issue does not violate the Sixth Amendment's requirement that all aggravating circumstances necessary for the imposition of the death penalty must be proved beyond a reasonable doubt.[3]*

First, appellant asserts that the trial court erred by failing to preclude the death penalty as a sentencing option and failing to declare Article 37.071 of the Texas Code of Criminal Procedure unconstitutional pursuant to the United States Supreme Court's holdings in *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). Appellant contends that Article 37.071 violates the Sixth Amendment's guarantee

---

[2] Appellant's pre-trial motion to preclude the death penalty reflects that appellant was aware the State was seeking the death penalty.  (I C.R. 103).  In addition, at the commencement of voir dire the trial judge announced that the State was seeking the death penalty.  (3 R.R. 6).  Appellant's trial counsel did not object to a lack of notice.

[3] The trial court denied appellant's motion to preclude the death penalty as a sentencing option and to declare Article 37.071 unconstitutional.  (I C.R. 109).  The trial court also denied appellant's "Motion to Declare Section 19:02-19:03 Texas Penal Code Unconstitutional."  (I C.R. 110-16).

of a jury trial because it permits the imposition of a death sentence without requiring the jury to determine beyond a reasonable doubt that the mitigating circumstances are insufficient to warrant a sentence of life imprisonment without parole.

The Supreme Court has held that a capital sentencing scheme runs afoul of the Sixth Amendment guarantee of a jury trial unless it requires the jury to find beyond a reasonable doubt an aggravating circumstance necessary for the imposition of the death penalty. *See Ring*, 536 U.S. at 609; *Apprendi*, 530 U.S. at 490. However, this Court has recognized a distinction between factors in aggravation of punishment and factors in mitigation. *Apprendi* and *Ring* apply only to aggravating facts "legally essential to the punishment." *Perry v. State*, 158 S.W.3d 438, 448 (Tex. Crim. App. 2004). As noted in *Perry v. State*, a defendant is eligible to receive the death penalty under Article 37.071 before the jury even reaches the mitigation special issue. *See id*. at 447-48. Accordingly, the jury does not have to find the mitigation special issue beyond a reasonable doubt because it is not an aggravating factor that increases punishment. *Id*. at 446-47.

Appellant acknowledges that this Court has decided and rejected his argument in *Perry*, but requests reconsideration of the issue. Appellant offers no meaningful argument or analysis explaining why the Court should reexamine its prior holding. *See* TEX. R. APP. P. 38.1(i) (an appellant's brief must contain "a clear

14

and concise argument for the contentions made, with appropriate citations to authorities and to the record"). The State asserts that this Court's holding in *Perry* is correct, and the Court should decline appellant's invitation to reconsider these issues and overrule his fourth point of error as inadequately briefed.

## II. The trial court did not err in failing to hold that the Texas capital murder statute violates the Due Process Clause because sudden passion is a mitigating factor for punishment, rather than a fact necessary to constitute the charged offense.

In his fifth point of error, appellant further alleges that the trial court should have found the Texas capital punishment scheme unconstitutional because the murder statute improperly treats sudden passion as an issue mitigating punishment. Section 19.02(d) of the Penal Code provides that, at the punishment stage of a murder trial, the defendant may raise an issue as to whether he caused the victim's death under the immediate influence of sudden passion arising from an adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(d) (West 2015). If the defendant proves sudden passion by a preponderance of the evidence, the offense is reduced to a second-degree felony. *Id*.

Here, appellant was convicted of capital murder under section 19.03(a)(7)(A) of the Penal Code for murdering more than one person during the same criminal transaction. Appellant appears to suggest that due process requires the State to prove the absence of sudden passion beyond a reasonable doubt to

15

secure a conviction for capital murder.[4]  Appellant equates section 19.02(d) of the Texas murder statute with a Maine statute that was deemed unconstitutional by the Supreme Court in *Mullaney v. Wilbur*, 421 U.S. 684 (1975).  The Maine statute required a defendant charged with murder to prove by a preponderance of the evidence that he acted in the heat of sudden passion to reduce the offense to manslaughter.  The Supreme Court held that this statute violated the Due Process Clause of the Fourteenth Amendment because the prosecution must prove every fact necessary to constitute the charged offense beyond a reasonable doubt.

*Mullaney v. Wilbur* is not controlling because sudden passion under section 19.02(d) is a mitigating factor at punishment, rather than a fact necessary to constitute the crime charged.  Prior to amendments to the murder statute in 1994, an individual who caused another's death under the influence of sudden passion was guilty of the lesser offense of voluntary manslaughter.  *See Lawrence v. State*, 700 S.W.2d 208, 210-11 (Tex. Crim. App. 1985).  After the statute was revised, voluntary manslaughter was eliminated and the issue of sudden passion became a mitigating factor that the defendant bore the burden to prove at the punishment stage of trial after a conviction for murder.  *See Wesbrook v. State*, 29 S.W.3d 103, 112-13 (Tex. Crim. App. 2000); *Moore v. State*, 969 S.W.2d 4, 8 n.1 (Tex. Crim.

---

[4] The nature of appellant's argument is difficult to discern because the entire point of error consists only of four loosely coherent sentences.

16

App. 1998); Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01. Considering that sudden passion is exclusively a mitigation issue, the absence of sudden passion is not an element which the State must prove beyond a reasonable doubt.

Appellant requests reconsideration of this issue to the extent that it has been adversely decided by *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004) and "other cases." *See* (Appellant's Brief p. 53). Yet appellant fails to offer any analysis supporting this request. Accordingly, appellant has not demonstrated that the capital murder statute is unconstitutional, and this point of error should be overruled as inadequately briefed. *See Garcia v. State*, 887 S.W.2d 862, 876 (Tex. Crim. App. 1994) (declining to construct an argument on the defendant's behalf when his point of error was wholly conclusory and offered no explanation), *overruled on other grounds by Hammock v. State*, 46 S.W.3d 889 (Tex. Crim. App. 2001).

## REPLY TO APPELLANT'S SIXTH POINT OF ERROR

*The trial court did not abuse its discretion in granting the State's challenge for cause to prospective juror William Hered because he gave contradictory responses regarding his willingness to follow the law.*

In his sixth point of error, appellant alleges that the trial court abused its discretion in granting the State's challenge for cause to prospective juror William Hered. Appellant contends that Hered's responses during voir dire show that he was able and willing to follow the law.

17

The State may raise a challenge for cause to a prospective juror if the juror has conscientious scruples regarding the infliction of the death penalty or if the juror harbors a bias or prejudice against any phase of law upon which the State is entitled to rely for conviction or punishment. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(1) & (b)(3) (West 2015). "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law." *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). The proponent of the challenge for cause bears the burden to establish that the veniremember understood the requirements of the law, but could not follow the law. *Id.*

The trial court's ruling on a challenge for cause is reviewed for an abuse of discretion because the trial judge is in the best position to observe the veniremember's demeanor and responses. *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011); *Gardner*, 306 S.W.3d at 295-96. Particular deference is accorded to the trial court's decision when the veniremember's responses are "ambiguous, vacillating, unclear, or contradictory." *Gardner*, 306 S.W.3d at 296.

During voir dire examination by the State, Hered gave contradictory answers regarding his ability to follow the law in assessing the death penalty. When asked about his thoughts on the death penalty, Hered indicated that "it would be hard morally to justify, you know, the death penalty for a crime." (8 R.R. 96). Hered

18

also equated the death penalty with "killing out of revenge," which he considered to be morally wrong. (8 R.R. 97). When asked whether he could participate in assessing the death penalty, Hered responded:

> It would be really hard, but I think if I was fully convinced during the trial, that I could vote in either way as long as I believed it. (8 R.R. 99).

However, he also stated that it would be "tough" for him to predict an individual's future dangerousness. (8 R.R. 101). Hered explained:

> I think my problem with that one is there really wouldn't be any evidence for a future event. There would be indications, but not really evidence. (8 R.R. 102).

In addition, Hered indicated that he would prefer not to participate in the process, but stated he "thought" he could. (8 R.R. 108). After further equivocating about his ability to answer the special issues in Article 37.071, Hered admitted that he would not follow the law:

> MR. GOODHART:  Are you going to be able to participate and answer truthfully the way the evidence is, or do you have a preconceived idea of what you would like the result to be because you prefer not to have a death penalty so that you would vote the questions in such a way to make sure that Mr. Prevost gets a life sentence? Would you do that and violate the oath?
>
> VENIREPERSON:  I could see that happening, yeah.
>
> MR. GOODHART:  Okay. When you say "I could see that happening," we're right back - -

19

VENIREPERSON:    That would be a "yes," then.

MR. GOODHART:    So, you would violate your oath to ensure that that would happen? That's what you would do? And that's okay. You cannot get in trouble.

VENIREPERSON:    Yeah. (8 R.R. 109-110).

Upon examination by the defense, Hered's stance fluctuated slightly. Hered stated that he could answer the special issues truthfully, but only in extreme cases:

If I was convinced on either one of those, like I said in the extreme case, then I would answer those questions truthfully regardless of the final outcome. However, I think that in my mind proving the Issue No. 1 would be difficult for me. (8 R.R. 114-15).

The trial judge resolved any ambiguity in Hered's prior responses through the following line of inquiry:

THE COURT:    Are you truly open to answering the questions according to the evidence if - - with your preference being towards life instead of death, are you truly open to answering the first question "yes" if the State proves it beyond a reasonable doubt and the second question "no" if you find insufficient mitigating evidence knowing that - - and it is the fact I will sentence him to death, he will die in prison by lethal injection as opposed to spending the rest of his life, however long that may be, in prison. Are you going to be able to answer those questions truthfully, or is your preference going to drive you to answer them in a way that life will be imposed? Which one do you think?

VENIREPERSON:    I can definitely see my preference influencing my answer to Question No. 1.

20

THE COURT: Okay. So, can you take the oath and answer the Question No. 1 regarding his probability to commit criminal acts of violence, constituting a continuing threat to society, can you answer that question truthfully according to your oath, "yes" or "no?"

VENIREPERSON: No. (8 R.R. 119-20).

The record clearly reflects that Hered could not overcome his prejudice against the law upon which the State was entitled to rely. In light of Hered's vacillating and contradictory responses, it was not an abuse of discretion for the trial court to grant the State's challenge for cause. Appellant's sixth point of error should be overruled.

## REPLY TO APPELLANT'S SEVENTH, EIGHTH, NINTH & TENTH POINTS OF ERROR

In his remaining four grounds of error, appellant asserts that the trial court abused its discretion in denying motions for mistrial despite the fact that the trial court sustained objections to the challenged evidence and promptly gave the jury instructions to disregard.

A trial court's denial of a mistrial is reviewed for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). "A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd*, 3 S.W.3d at 567. The particular facts of the case must be examined to determine whether a mistrial

21

was necessary. *Id.* It is presumed that an instruction to disregard cures any error from the admission of improper testimony, "except in extreme cases where it appears that the question or evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds." *See Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (quoting *Thompson v. State*, 612 S.W.2d 925, 928 (Tex. Crim. App. 1981)).

I.   *The introduction of inadmissible testimony regarding an extraneous incident did not necessitate a mistrial.*

Appellant contends that the trial court should have granted a mistrial after the admission of improper and prejudicial extraneous offense testimony. The record reflects that State's witness Vicki Alexander testified she had personal knowledge of an extraneous incident where appellant removed everything from his wife's home. (23 R.R. 202). However, upon voir dire examination by defense counsel, Alexander acknowledged that she had not actually witnessed this event. (23 R.R. 203). The trial court instructed the jury to disregard Alexander's statement, but denied defense counsel's motion for mistrial. (23 R.R. 203).

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." TEX. RULE EVID. 602. However, the trial court did not abuse its discretion in refusing to grant a mistrial because an instruction to disregard generally suffices

22

to cure error from an improper question and answer, even one regarding extraneous offenses. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Thompson*, 612 S.W.2d at 928. In this case, Alexander's testimony was not of such an inflammatory nature that the jury would have been unable to follow the trial court's instruction to disregard.

Appellant alleges, without offering any meaningful analysis, that Alexander's testimony was so prejudicial that it was impossible for the jury to withdraw the impression that appellant had a history of preying on women. *See* (Appellant's Brief p. 59). However, immediately preceding the objectionable statement, the State properly introduced admissible extraneous offense testimony from Alexander that appellant had threatened to hurt his wife and she had obtained a protective order against him. (23 R.R. 201-02).

Moreover, the objectionable statement was fairly insignificant compared with the numerous extraneous offenses committed by appellant involving violence against women. Appellant's first wife, Gloria Freeman, testified that appellant would strike her and choke her. (24 R.R. 41-42). Appellant's daughter Theressal testified that appellant was arrested in June of 2005 for assaulting her mother. (24 R.R. 169-70). In addition, defense witness Alesia Bean testified that she was in a relationship with appellant, and that he would push her, slap her, and choke her. (26 R.R. 29, 34, 40).

23

State's witness Jacqueline Eaglin testified about an incident on January 16, 1985 where she happened to encounter appellant trying to enter her neighbor's apartment. (25 R.R. 6). Eaglin had never met appellant before. (25 R.R. 9). She told appellant that her neighbor was not home. (25 R.R. 6). Eaglin testified that appellant suddenly jumped on her and began hitting and choking her. (25 R.R. 7). Two men had to forcibly pull appellant off of Eaglin. (25 R.R. 8).

Victoria Lewis testified that she had been assaulted by appellant while she and the appellant were both living in Alexander's apartment. The evidence showed that Lewis and appellant got into an argument about the fact that Lewis's three-year-old daughter had been sitting on the kitchen counter. (25 R.R. 15). Appellant grabbed Lewis by the neck, lifting her off the ground, and said he would kill her. (25 R.R. 16).

Lauralee Simmons testified that on August 31, 1980, she gave appellant a ride home from a disco club. (25 R.R. 35-36). When Simmons parked the car, appellant became aggressive and forcibly attempted to kiss her and touch her breasts. (25 R.R. 37-38). When Simmons resisted appellant's advances, he put his hands around her neck, choked her, and stole her car. (25 R.R. 39-40).

Dawn Windon testified that she previously dated appellant for a few months. (25 R.R. 57, 65). Windon ended the relationship after appellant punched her in the mouth and swung a hammer at her head. (25 R.R. 65-67). Appellant began

24

stalking her. (25 R.R. 67-68). Windon testified about an incident where she went to stay at a male friend's home. Appellant jumped out of a tree, overpowered her friend, smashed the window of the car she was sitting in, pulled her out of the car by her hair, and took her to an unoccupied house. (25 R.R. 71-74). Appellant kicked her in the face and stomach, and tied her legs together with rope. (25 R.R. 74-75). Appellant kept her confined within the house for two days, and struck her ankle with a hammer when she attempted to escape. (25 R.R. 75). Windon testified that appellant eventually took her to his mother's home. (25 R.R. 79). When the police came to the home, appellant hid her in his mother's bedroom, held a bolt cutter against her wrist, and threatened to cut her if she alerted the police to her presence. (25 R.R. 79-80). Windon's family members eventually secured her release and took her to the hospital. (25 R.R. 83-84). Windon underwent surgery to have a screw inserted in her right leg, and one of her ovaries was removed. (25 R.R. 85).

Finally, Muriel Bell testified about an occasion where she had allowed appellant to enter her home because he had asked for a glass of water. (25 R.R. 102-03). While she was in the kitchen putting ice in the glass, appellant came up behind her and wrapped a belt around her neck. (25 R.R. 103). Appellant choked Bell until she urinated on herself and lost consciousness. (25 R.R. 103-08). Bell woke up in the hospital. (25 R.R. 107-08).

25

Considering the aforementioned evidence, it is highly improbable that the jury would have attributed much significance to Alexander's testimony that appellant had removed all of the furniture from his wife's home. Accordingly, the trial court did not abuse its discretion in overruling appellant's motion for mistrial.

*II.* *The trial court did not abuse its discretion in refusing to grant a mistrial after Vicki Alexander testified that she wanted appellant to receive the death penalty.*

Appellant also contends that the trial court should have granted a mistrial after Vicki Alexander testified that she wanted him to receive the death penalty. The record reflects that this testimony was elicited when the prosecutor asked Alexander's opinion about a letter appellant had written to her asking for money while he was incarcerated on the charged offense. In the letter appellant wrote "I'm sure they will seek the death penalty," and "It's only a matter of time before they execute me or send me to a mental hospital." (23 R.R. 207-08; 33 R.R. SX 328). The challenged testimony was introduced during the following line of inquiry:

Q:     . . . So, when you received this letter, what did you think?

A:     You want me to tell you what I honestly think?

Q:     Yes, ma'am.

MR. TANNER:     Excuse me. I'm going to object as relevancy, Judge.

THE COURT:     Overruled. You may answer the question.

26

A:     When I received that letter, I was very, very angry. And when he put in the letter he knew he was going to get the death penalty, and I said: I want you to get it, too.

(23 R.R. 208-09). The trial court sustained defense counsel's objection that the testimony was non-responsive, and instructed the jury to disregard the statement. (23 R.R. 209).

Alexander's statement, although prejudicial, was not so emotionally inflammatory that the trial court's curative instruction was insufficient. In *Simpson v. State*, 119 S.W.3d 262, 272-74 (Tex. Crim. App. 2003), this Court held that a mistrial was not required despite the introduction of inadmissible testimony that the victim's family wanted the defendant to receive the death penalty. In that case, the evidence in support of the jury's punishment verdict was substantial, and the prejudicial impact of the testimony was cured by a prompt instruction to disregard. *Id*.

Similarly, any prejudice resulting from Alexander's statement was cured by the trial court's immediate instruction to disregard. In addition, the jury's assessment of the death penalty was supported by evidence of appellant's extensive criminal history, including his record of violence against women. The evidence admitted at the punishment phase of trial also showed that, if sentenced to life in prison, appellant would be assigned to the prison's general population where he would routinely come into contact with female prison guards and other female

staff. (26 R.R. 183-84; 27 R.R. 24-25, 86-88). In addition, the jury heard appellant's confession, in which he stated that he deserved and wanted to receive the death penalty. (21 R.R. SX 197). Appellant also described himself as a "walking time bomb," and asserted that even if he had not killed the complainant, he would have eventually killed someone else. *Id*.

Furthermore, the jury would not have attached great significance to Alexander's comment considering that the complainant was like a sister, and had been her best friend for the past 29 years. (23 R.R. 147). *See Simpson*, 119 S.W.3d at 274 (observing that the jury would not have placed great weight on the erroneously elicited comment because jurors understand that the victim's family members will be emotional about the assessment of punishment). Therefore, Alexander's comment was not so prejudicial that the jury would not have been able to withdraw its impression.

III. *It was not improper for the prosecutor to ask a question on cross-examination implying facts already in evidence.*

In his ninth point of error, appellant contends that the trial court should have granted a mistrial when the prosecutor asked an improper question upon cross-

28

examination of defense witness Thomesa Hollins, appellant's younger sister.[5]  The record reflects that defense counsel objected when the prosecutor questioned Hollins about a previous incident where appellant had been arrested for threatening their mother:

Q:      Well, he was arrested for terroristic threat, which is threatening to harm someone, like threatening to bust someone's head open.

A:      I don't know if he was arrested that day.  I know there was something in the parole that - - they had a hearing and I'm thinking that he was arrested during the time they went to the hearing for his parole.

Q:      Right.  They had a hearing because of the terroristic threat - -

A:      Right.

Q:      - - of threatening to bust your mom's head open, right?

A:      Right.

Q:      With your mom and her relationship with the defendant, there were - - she had quite a rocky relationship with him and there were times when she would say to many people that she was not going to allow him to bully her, right?

A:      Right.

---

[5] In the heading for this point of error, appellant states "The trial court erred in denying appellant's motion for a mistrial after the admission of Thomesa Hollins unresponsive and prejudicial testimony." (Appellant's Brief pp. 62-63).  However, in the analysis for this point of error appellant actually complains that a mistrial should have been granted because the prosecutor's question was improperly phrased.  Appellant does not argue that the witness's response was prejudicial.  Moreover, the objection raised at trial was only to the prosecutor's statement.

Q:     And there were many times where she, for her own - - it was important for her that he didn't see that she was scared of him, wasn't it?  And what did she do to try to protect herself, to show that she wasn't scared of him?

A:     Shot at him.

Q:     She shot at him?

A:     Uh-huh.

Q:     Because she felt like she had to protect herself, right?

A:     It all depends on the situation - -

MR. TANNER:     I'm going to object the prosecutor stating the reasoning on why she thinks the defendant's mother shot a gun at him.

THE COURT:     Sustained.

MR. TANNER:     And ask that the jurors be instructed to disregard.

THE COURT:     The jury will disregard the last statement by the prosecutor.

MR. TANNER:     Thank you.  And we move for a mistrial.

THE COURT:     That's denied.  (26 R.R. 78-79).

Appellant asserts that it was improper for the prosecutor to ask a question which implied that appellant's mother was trying to protect herself from appellant, but provides no argument demonstrating that the question was improper.  Appellant also summarily contends that the question was so prejudicial that it could not be cured by an instruction to disregard, but fails to offer any analysis showing the

30

prejudicial impact of the prosecutor's question. Neither the State, nor this Court, is obliged to construct an argument on the appellant's behalf. *See Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008). Accordingly, the State invites this Court to overrule this point of error as inadequately briefed.

Furthermore, the prosecutor's question was not improper. It is improper for the prosecution "to fabricate inflammatory facts and suggest them into evidence by cross-examination." *Rogers v. State*, 725 S.W.2d 350, 360 (Tex. App.--Houston [1st Dist.] 1987, no pet.); *see also Hartman v. State*, 507 S.W.2d 553, 556 (Tex. Crim. App. 1974) (holding that the prosecution "cannot attempt to establish a theory of appellant's action by questions alone, with no basis of fact"). Here, however, there was a factual basis for the prosecutor's insinuation that appellant's mother fired a gun at him in self-defense. The State presented evidence that appellant picked up a container of baby wipes and held them over his mother in a threatening gesture, that she fired a shot at him, and that he was arrested for making a terroristic threat. (24 R.R. 77-79, 114). The State also introduced testimony from appellant's half-brother, Kevin Jones, that it would not surprise him that appellant threatened his 60-year-old mother with bodily injury. (26 R.R. 180).

However, even assuming that the prosecutor's cross-examination was improper, an improper question rarely requires a mistrial because any resulting harm can typically be cured by an instruction to disregard. *Ladd*, 3 S.W.3d at 567.

31

It is presumed that the jury followed the trial court's instruction to disregard. *See Ovalle*, 13 S.W.3d at 783; *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). "A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd*, 3 S.W.3d at 567.

In this case, the jury heard unchallenged testimony that appellant was arrested for threatening to bust his mother's head open, that appellant's mother had stated she would not allow appellant to bully her, and that appellant's mother had fired a shot at him. (26 R.R. 77-79). Thus, the probable impact of the challenged statement upon the jury was minimal. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (holding that an error in the admission of evidence is cured where the same evidence comes in elsewhere without objection). As such, appellant's ninth point of error should be overruled.

IV. *A mistrial was not required to cure error from the prosecutor's assertion that bribery of correctional officers is prevalent within the Texas Department of Corrections.*

Finally, appellant complains that a mistrial should have been granted after the prosecutor implied on cross-examination that the Texas Department of Corrections' inmate classification system is unreliable due to the high occurrence of bribery of prison guards. The objectionable statement occurred during the

cross-examination of Lane Herklotz, a former state classification committee member. Herklotz testified about the varying degrees of restraint associated with the different custody levels assigned to inmates at correctional facilities. The prosecutor pursued the following line of inquiry suggesting that the accuracy of the inmate classification system could be impaired by corruption within the correctional facility:

> Q: . . . How about ethics? I think they teach ethics in there now.
>
> A: They do.
>
> Q: The reason for that is because of bribery?
>
> A: Correct.
>
> Q: There's a high incidence of bribery of prison guards, correctional officers, inside TDC because you're the 47th out of 50 states - -
>
> MR. CORNELIUS: I'm going to object to this as not being relevant to the issue in this case, Your Honor.
>
> THE COURT: Sustained.
>
> MR. CORNELIUS: And ask the jury to be instructed to disregard it.
>
> MR. GOODHART: Judge, it goes to the credibility of this witness as to his underlying thought process as to how he just classified this man. I mean, if he doesn't understand what's going on inside of his own prison system, how can he tell us - - this jury what the classification is.
>
> THE COURT: I sustained the objection. Ask another question.

33

MR. CORNELIUS:    Ask the jury to be instructed to disregard it.

THE COURT:    The jury will disregard the last statement by the prosecutor.

MR. CORNELIUS:    Move for a mistrial.

THE COURT:    Denied. (27 R.R. 64-65).

To any extent that the prosecutor's question attempted to elicit irrelevant evidence, the trial court's instruction to disregard rendered the question harmless. Moreover, the witness had already testified without objection that bribery of correctional officers has prompted mandatory ethics training. (27 R.R. 64). "Despite the improper form and content of the question, it is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered." *Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984).

Furthermore, the trial court promptly instructed the jury to disregard the prosecutor's statement. "Because curative instructions are presumed efficacious to withdraw from jury consideration almost any evidence or argument which is objectionable, trial conditions must be extreme before a mistrial is warranted under Texas law." *See Bauder v. State*, 921 S.W.2d 696, 700 (Tex. Crim. App. 1996), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). Absent any argument from appellant demonstrating that the question was of

34

such a nature that the curative instructive was insufficient to withdraw the impression produced on the minds of the jury, this Court should hold that appellant has not overcome the presumption that the jury followed the trial court's instruction to disregard.

## CONCLUSION AND PRAYER

It is respectfully submitted that all things are regular and the conviction should be affirmed.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ Heather A. Hudson
**HEATHER A. HUDSON**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
State Bar No. 24058991
hudson_heather@dao.hctx.net
curry_alan@dao.hctx.net

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this computer-generated document has a word count of 8,259 words, based upon the representation provided by the word processing program that was used to create the document.

/s/ Heather A. Hudson
**HEATHER A. HUDSON**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
State Bar No. 24058991

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing instrument has been submitted for service by e-filing to the following address:

Douglas M. Durham
2800 Post Oak Blvd., Suite 4100
Houston, Texas 77002
Tel: (832) 390-2252
Fax: (832) 390-2350
State Bar No. 06278450
durham.doug@yahoo.com

/s/ Heather A. Hudson
**HEATHER A. HUDSON**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
State Bar No. 24058991

Date: 6/30/2015

36